UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANK OLIVIER,

                              Plaintiff,

        v.

COUNTY OF ROCKLAND and
ROCKLAND COUNTY SHERIFF'S
DEPARTMENT,

                              Defendants.

No. 15-CV-8337 (KMK)

OPINION & ORDER

Appearances:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Robert B. Weissman, Esq.
Saretsky Katz Dranoff & Glass LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Frank Olivier ("Plaintiff") brings this Action, pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5 *et seq.*, against Defendants County of

Rockland (the "County") and Rockland County Sheriff's Department (the "Sheriff's

Department") (collectively, "Defendants"), alleging that Defendants retaliated against him for

filing a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").

(Am. Compl. (Dkt. No. 29).)[1]  Before the Court is Defendants' Motion for Summary Judgment. (Not. of Mot. (Dkt. No. 55).)  For the reasons to follow, the Motion is denied.

## I.  Background

### A.  Factual Background

The Court has described the allegations and procedural history of this case in two prior Opinions.  *See Olivier v. County of Rockland*, No. 15-CV-8337, 2017 WL 934711, at *1–3 (S.D.N.Y. Mar. 8, 2017); *Olivier v. County of Rockland*, No. 15-CV-8337, 2018 WL 401187, at *1–2 (S.D.N.Y. Jan. 11, 2018).  The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motion.

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 60); Plaintiff's Rule 56.1 Reply and Counterstatement, (Pl.'s Rule 56.1 Reply & Counterstatement ("Pl.'s 56.1 Reply") ("Pl.'s 56.1 Counter") (Dkt. No. 76)), and the admissible evidence submitted by the Parties.[2, 3]

---

[1] Plaintiff's Complaint and Amended Complaint included disparate treatment and hostile work environment claims, (*see* Compl. (Dkt. No. 1); Am. Compl.), but all claims other than Plaintiff's retaliation claim have been dismissed with prejudice, (*see* Dkt. Nos. 28, 45).

[2] Plaintiff submitted one document containing both his Rule 56.1 Reply and Rule 56.1 Counterstatement.  (*See* Dkt. No. 76.)  To avoid confusion, the Court cites Plaintiff's Reply and Counterstatement separately.

[3] Where possible, the Court has relied on and cited to the undisputed facts in the Parties' Rule 56.1 Statements.  Where a statement is uncontested, the Court will cite the Parties' 56.1 Statements.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

Additionally, Defendants did not submit a response to Plaintiff's 56.1 Counterstatement. The Court will treat the facts asserted in Plaintiff's 56.1 Counterstatement as undisputed to the extent they are supported by record evidence and Defendants' submissions do not contradict them.

## 1. Plaintiff's 1997–2004 Absence Due to Post-Traumatic Stress Disorder

Plaintiff is a former corrections officer ("C.O.") who was employed at the Rockland County Correctional Facility (the "Jail"). (Defs.' 56.1 ¶ 1.) Defendant County is a municipality within the State of New York. (*Id.* ¶ 2.)

In 1995, in the course of Plaintiff's employment at the Jail, Plaintiff shot Alex Sostre ("Sostre"), a fleeing inmate. (*Id.* ¶ 8.) In 1997, Plaintiff "started having a lot of . . . feelings about the shooting." (*Id.* ¶ 11.) Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") as a result of shooting Sostre and working in the Jail near him. (*Id.* ¶ 12.)

Because of Plaintiff's PTSD, he was disabled from his employment at the Jail from August 6, 1997 through April 3, 2004. (*Id.* ¶ 13.) Plaintiff made a Worker's Compensation claim, and received benefits, in connection with his absence from work during this period. (*Id.* ¶¶ 15–16.) Plaintiff recalls that in the 1990s, a Dr. Luria wrote in a report that Plaintiff should permanently change his occupation. (Aff. of Michael H. Sussman, Esq. ("Sussman Aff.") (Dkt. No. 74) Ex. 4 (Plaintiff's Deposition Transcript ("Pl. Dep.")) 30.)[4]

On April 3, 2004, Plaintiff returned to work at the Jail. (Defs.' 56.1 ¶ 17.) As of that date, his PTSD did not prevent him from carrying out his duties as a corrections officer. (*Id.* ¶ 18.) The Chiefs of Corrections during Plaintiff's absence from August 1997 to April 2004 were Nicholas Solfaro and William Clark. (*Id.* ¶ 19.)

## 2. Plaintiff's 2013 and 2014 Disciplinary Charges

As of June 26, 2013 Plaintiff was actively working at the Jail. (*Id.* ¶ 20.) During the 11:00 p.m. to 7:00 a.m. shift from June 26 to June 27, 2013, Plaintiff performed several magic

---

[4] Where the Parties submit different portions of the same deposition transcript, the Court will cite to the relevant page numbers of the transcript only rather than to the separate exhibits.

tricks for an inmate.  (*Id.* ¶ 21.)  Some of the magic tricks involved passing items to the inmate.  (*Id.* ¶ 22.)  On June 27, 2013, Plaintiff was charged with four counts of gross misconduct in connection with the magic tricks.  (*Id.* ¶ 23.)  Following arbitration, Plaintiff was found guilty of three of the counts of gross misconduct.  (*Id.* ¶ 24.)

On September 10, 2013, Plaintiff was charged with gross misconduct for violation of the Jail's social media and weapons policies.  (*Id.* ¶ 25.)  On December 27, 2013, Plaintiff was charged with insubordination for using personal and sick leave with insufficient accruals available.  (*Id.* ¶ 26.)

Plaintiff was medically able to and did work at the Jail during the first two weeks of April 2014.  (*Id.* ¶¶ 27–28.)  On April 14, 2014, Plaintiff was suspended from his employment at the Jail, (*id.* ¶ 29), and charged with gross misconduct for associating with known criminals, (*id.* ¶ 30).  Plaintiff remained suspended for the remainder of 2014.  (*Id.* ¶ 31.)  The first thirty days of Plaintiff's suspension were unpaid, and thereafter he was placed on paid suspension.  (*Id.* ¶¶ 32–33.)  The County subsequently paid Plaintiff for the initial thirty-day period.  (*Id.* ¶ 34.)

Chief Anthony Volpe ("Volpe") ultimately dismissed the charges against Plaintiff and never brought them to a hearing.  (Pl.'s 56.1 Reply ¶ 34 (citing Decl. of Robert B. Weissman, Esq. ("Weissman Decl.") (Dkt. No. 61) Ex. C (Volpe's Deposition Transcript ("Volpe Dep.")) 26–27).)  Volpe dismissed the charges after having a discussion with the county attorney who felt "it was in the best interest" to dismiss the charges.  (Volpe Dep. 27.)[5]  Assistant County Attorney for the County of Rockland Jeffrey Fortunato ("Fortunato"), who served as counsel to

---

[5] Plaintiff mischaracterizes Volpe's deposition testimony in stating that Volpe never advised him that he was dismissing the April 2014 disciplinary charges.  (Pl.'s 56.1 Counter ¶ 4 (citing Volpe Dep. 37).)  Volpe testified that he did not recall whether he advised Plaintiff that he was dismissing the charges.  (Volpe Dep. 37.)

the Sheriff for personnel matters, stated that he had no knowledge as to why Plaintiff was suspended in April 2014 or why he was returned to work eight months later before any disciplinary hearing was held on the charges. (Pl.'s 56.1 Reply ¶ 34 (citing Sussman Aff. Ex. 1 (Fortunato's Deposition Transcript ("Fortunato Dep.") 24–27).) Fortunato was asked to prosecute the disciplinary charges but did not. (Fortunato Dep. 27.) Shortly after Fortunato provided advice to Volpe concerning these charges, they were withdrawn. (*Id.* at 28.) Fortunato alleges that he does not recall the year when these charges were withdrawn and whether it was before January 2015. (*Id.* at 29–30.)

### 3. Plaintiff's EEOC Charge

On November 17, 2014, while still on paid suspension, Plaintiff filed a charge of discrimination with the EEOC ("EEOC Charge"), (Defs.' 56.1 ¶ 35), alleging that he had been subjected to racially motivated disciplinary charges, (*id.* ¶ 36). The EEOC issued a Notice of Charge ("EEOC Charge") dated January 20, 2015. (*Id.* ¶ 37.)

The County received the EEOC Charge on January 26, 2015, (*id.* ¶ 38), the first day it learned of the EEOC Charge, (*id.* ¶¶ 39, 43–44).[6] On the afternoon of January 26, 2015, Undersheriff Mary Barbera ("Barbera") sent an e-mail to County Attorney Thomas Humbach stating, "[w]e received this today, regular mail," (*id.* ¶ 40), and attached the EEOC Charge, (*id.* ¶ 41). Barbera copied Volpe and Fortunato on her e-mail. (*Id.* ¶ 42.)

---

[6] Defendants' Rule 56.1 Statement states that Volpe and Fortunato learned of the EEOC Charge on *June* 26, 2015. (Defs.' 56.1 ¶¶ 43–44.) However, the sources Defendants cite to state that Defendants learned of the EEOC Charge on *January* 26, 2015, not *June* 26, 2015. (Volpe Dep. 46; Decl. of Anthony Volpe ("Volpe Decl.") ¶ 16 (Dkt. No. 56); Decl. of Jeffrey J. Fortunato ("Fortunato Decl.") ¶13 (Dkt. No. 57).) The Court therefore treats the *June* 26, 2015 dates as typos and reads Defendants' Rule 56.1 Statement to state that they learned of the EEOC Charge on *January* 26, 2015.

### 4. Plaintiff's Note

On January 9, 2015, Volpe issued a letter directing Plaintiff to return from suspension to full-duty, effective January 17, 2015.  (Defs.' 56.1 ¶ 45.)  When Volpe sent the January 9, 2015 letter, he did not know Plaintiff had filed the EEOC Charge.  (*Id.* ¶ 46.)

The January 9, 2015 letter stated that January 17, 2015 and January 18, 2015 would be treated as Plaintiff's regular days off for that week, and he should return for his first day of work on January 19, 2015.  (*Id.* ¶ 47.)

On January 16, 2015, Plaintiff submitted a doctor's note to the County, dated January 15, 2015 (the "January 15 Note").  (*Id.* ¶ 49.)  Volpe received the January 15 Note on January 16, 2015.  (*Id.* ¶ 50.)  The entirety of the January 15 Note, other than the heading and signature areas, read, "Mr. Olivier is a patient of Stat Health Medical Service and is under my care.  He may not return to work until further notice."  (*Id.* ¶ 51.)

The January 15 Note did not identify any illness or physical disability for which Plaintiff was receiving care, (*id.* ¶ 54), or explain why Plaintiff would not be able to carry out his duties as a corrections officer, (*id.* ¶ 55).[7]  Plaintiff stated that Volpe did not contact him at the time this

---

[7] Plaintiff interjects semantic objections and irrelevant facts to dispute Defendants' accurate factual description of what the January 15 Note states.  Plaintiff argues that Volpe made no efforts to obtain further information about Plaintiff's condition from either Plaintiff or his Doctor at the time he received the Note.  (Pl.'s Reply ¶¶ 53–55.)  Not only is this inaccurate but it is also irrelevant to describing the contents of the Note.

Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, will not be considered by the Court as creating disputes of fact.  *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the]

Note was submitted to notify him of any deficiency in the Note. (Pl.'s 56.1 Counter ¶ 7 (citing

Aff. of Frank Olivier. ("Pl. Aff.") ¶ 4 (Dkt. No. 75)).)

The January 15 Note was signed by Dr. Luigia Gina Notaristefano ("Dr. Notaristefano"),

an internist and Plaintiff's general practitioner. (Defs.' 56.1 ¶¶ 52, 56–57.) Dr. Notaristefano

was not a psychiatrist or a psychologist. (*Id.* ¶¶ 58–59.) In 2009, Dr. Notaristefano was

convicted of criminal diversion of medications and prescriptions. (*Id.* ¶ 60.) On or about

November 3, 2010, Dr. Notaristefano was censured and reprimanded by the New York State

Department of Health, placed on probation for three years, fined $2,500, and "permanently

precluded from prescribing, ordering, administering and dispensing controlled substances." (*Id.*

¶ 61.)[8]

### 5. Plaintiff's FMLA Application

Plaintiff's union during the relevant time period was the Corrections Officers Benevolent

Association of Rockland County ("COBARC"). (*Id.* ¶ 67.) Article XII, § 5 ("Sick Leave") of

---

[d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements").

Plaintiff's counsel, Michael H. Sussman, Esq., violates Local Rule 56.1 throughout his 56.1 Reply and Counterstatement by interjecting argument, making unsupported statements, or at worst, even making statements that are clearly contradicted by the record. (*See, e.g.*, Pl.'s 56.1 Reply ¶¶ 70, 72, 80, 86, 89–90, 96, 99, 107, 113–14, 119, 129, 139–44, 151–52, 154, 159–60, 171, 174, 179, 188–89, 196, 207–08, 210, 212, 214–15, 218–21, 236; Pl.'s 56.1 Counter ¶¶ 8, 29, 32–34, 90, 102, 111.) Defendants too mischaracterize the record at points, (*see, e.g.*, Defs.' 56.1 ¶¶ 139–43), but those mischaracterizations are few and far between.

[8] Plaintiff admits that Dr. Notaristefano faced disciplinary consequences but interjects that there is no evidence that Volpe or Fortunato knew about Dr. Notaristefano's record when they rejected the January 15 Note and that Dr. Notaristefano's background is not relevant to her treatment of Plaintiff. (Pl.'s Reply ¶¶ 60–61.) Plaintiffs' 56.1 Reply violates Local Civil Rule 56 because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts . . ." *Pape*, 2013 WL 3929630, at *1 n.2.

the COBARC collective bargaining agreement ("COBARC CBA") with the County states, in part:

> (b) Sick leave shall be authorized in the event of the illness or other physical disability of the employee . . . . The employee is responsible for notifying their supervisor or the Sheriff each time sick leave is to be taken and the reason therefore . . . .

> (d) The Sheriff in his discretion, may require such proof of illness or disability as he may deem necessary . . . .

> (t) Failure to provide proper notification, failure to submit such proof or illness or disability as may be required, unsatisfactory evidence of illness or evidence indicating that the physical condition of the employee was not such as to justify absence from work or any other abuse of sick leave may be cause for disciplinary action at the discretion of the Sheriff.

(Defs.' 56.1 ¶ 48.)

Personal leave is defined as "leave with pay for personal business including religious observances, which for compelling reasons require the employee to absent themselves from work." (Pl.'s Reply ¶ 68 (citing Decl. of Anthony Volpe ("Volpe Decl.") (Dkt. No. 56) Ex. F (COBARC CBA) 11).) Pursuant to Article XII, § 7 of the COBARC CBA, personal leave could not be charged against other leave credits and could not be used in place of or to extend vacation. (Defs.' 56.1 ¶ 68.)

Paid Family Medical Leave Act ("FMLA") leave involves using an employee's sick leave and vacation concurrently with his or her FMLA leave. (*Id*. ¶ 66.) Unpaid FMLA leave involves taking leave without using accrued paid sick, vacation, or other leave. (*Id*. ¶ 65.)

On January 16, 2015, Plaintiff filed an application for FMLA leave. (*Id*. ¶ 62.) Plaintiff's FMLA application asked that his leave begin on January 19, 2015, (*id*. ¶ 63), and stated that he was requesting unpaid leave, (*id*. ¶ 64).

The Parties dispute whether personal leave could be used concurrently with FMLA leave. Defendants argue that because Article XII, § 7 of the COBARC CBA provides that personal leave cannot be charged against other leave credits and could not be used in place of or to extend vacation, personal leave cannot be used concurrently with FMLA leave. (Defs.' 56.1 ¶ 69 (citing COBARC CBA 11; Decl. of Capricia J. Gilman ("Gilman Decl.") (Dkt. No. 59) ¶ 38).) Defendants cite the Declaration of Capricia J. Gilman ("Gilman"), the Jail Personnel Clerk who processed Plaintiff's leave requests. She stated that under the COBARC CBA, "Plaintiff's personal leave could not be used concurrently with his FMLA leave, nor could it be used to extend his use of vacation time after the end of his FMLA leave." (Gilman Decl. ¶ 38.) When Gilman applied Plaintiff's vacation and sick leave, she therefore "did not apply his personal leave . . . [because] Plaintiff had requested paid FMLA leave . . . but had not separately requested payment for his 32 hours of personal leave." (*Id.*) Gilman left Plaintiff's 32 hours of personal leave on the books. (*Id.*) Plaintiff counters that the "CBA does not discuss this issue in any manner." (Pl.'s Reply ¶ 69.) Plaintiff is correct that the CBA does not expressly state whether personal leave may be used concurrently with FMLA leave.

### 6. Plaintiff Placed on Leave Without Pay Status

#### a. Communication Between Volpe and Fortunato

On January 19, 2015, Plaintiff did not return to work. (Defs.' 56.1 ¶ 70.) On January 23, 2015, Volpe e-mailed Fortunato to ask if Plaintiff was entitled to "night differential" (10% extra pay for employees on the 3:00 p.m. to 11:00 p.m. and 11:00 p.m. to 7:00 a.m. shifts) since Plaintiff was supposed to be working the 11:00 p.m. to 7:00 a.m. shift but he had not returned to work. (*Id.* ¶ 71.)

Volpe's e-mail to Fortunato read: "[Plaintiff] was assigned to the day shift until January 10, 2015 when he bid for 11–7. He was ordered back to duty starting the 17th but did not return as he had a doctor's note . . . . Does he get the night differential since he never actually started working the night shift?" (Defs.' 56.1 ¶ 72.)

At this time Fortunato had been an attorney for the County in the Office of Personnel for over twenty years. (*Id.* ¶ 73.) Fortunato's duties during his tenure in the Personnel Department included representing the County in labor relations disputes and providing legal advice to County administrators, including the Chief of Corrections, as to personnel and labor matters. (*Id.* ¶ 74 (citing Fortunato Decl. ¶ 2).) Fortunato did not begin to formally advise the Sheriff on a consistent basis with respect to labor and personnel matters until middle to late 2014. (Pl.'s 56.1 Reply ¶ 74 (citing Fortunato Dep. 22).) Fortunato stated that at the time Plaintiff submitted his January 15 Note, Fortunato was "at the very beginning of [his] relationship with []Volpe." (Fortunato Dep. 36.)

The Parties dispute the extent to which Fortunato was familiar with "under my care" notes, in which a doctor simply states that an employee is under the doctor's care and cannot return to work. Defendants argue that Fortunato had seen such notes on previous occasions, observed that employees sometimes used such notes to take time off from work without using vacation days, and advised County administrators to whom he spoke that such notes were unacceptable because they failed to state that the employee could not carry out his or her duties by reason of illness or other disability and therefore did not justify sick leave. (Defs.' 56.2 ¶¶ 75–78 (citing Fortunato Decl. ¶ 7).) Plaintiff points out that Fortunato admitted, during his deposition, that he did not know whether such "under my care" notes had routinely been accepted by Volpe, and whether Volpe had ever previously rejected a note with similar content.

(Pl.'s 56.1 Reply ¶ 75 (citing Fortunato Dep. 35–36).) Fortunato stated that Volpe told him that it was his understanding that the January 15 Note was "sufficient for personnel purposes." (Fortunato Dep. 34–35.)

On January 23, 2015, Fortunato wrote back to Volpe stating: "I am unaware that [Plaintiff] has provided a valid Dr's note. The 'under my care' note was insufficient to justify the use of sick leave. If he has not provided arguably sufficient medical documentation he should have been put on unauthorized leave (AWOL) and should not be paid." (Defs.' 56.1 ¶ 79.) This was the first time that Fortunato spoke with Volpe about "under my care" notes. (*Id.* ¶ 80.)

### b. Communications With Plaintiff Regarding his Status

Defendants assert that on January 23, 2015, Volpe placed Plaintiff on leave without pay status ("LWOP"), effective January 17, 2015, and cite to the Declarations of Volpe, Fortunato, and Gilman, as well as Gilman's contemporaneous notes, as evidence. (Defs.' 56.1 ¶ 81 (citing Volpe Decl. ¶ 14; Fortunato Decl. ¶ 12; Gilman Decl. ¶¶ 6–10, Ex. A (Gilman Handwritten Attendance Records for Plaintiff ("Gilman Record") RC 836).)[9] Plaintiff argues that Volpe only advised him that he was placed on LWOP status on January 30, 2015, not January 23, 2015. (Pl.'s 56.1 Reply ¶ 81 (citing Volpe Dep. 50; Pl. Aff. Ex. 3 (Jan. 30, 2015 Letter from Volpe to Plaintiff ("January 30 Letter")).)

---

[9] Citing Volpe's Declaration, Defendants state that an employee on LWOP cannot use paid leave, such as sick leave, vacation, or personal days. (Defs.' 56.1 ¶ 83 (citing Volpe Decl. ¶ 14).) Plaintiff correctly points out that the COBARC CBA does not have a section on AWOL status. (Pl.'s 56.1 Reply ¶ 83; COBARC CBA.) The CBA does, however, have a LWOP section, but that section does explain how LWOP impacts an employee's ability to use sick leave, vacation, or personal days. (COBARC CBA Art. XIII.) Plaintiff does not, however, point to any evidence to contradict Volpe's statement that it was County policy to not allow employees on LWOP status to use various forms of paid leave and benefits. Whether the CBA contained such a provision is a separate question.

The January 30 Letter advised Plaintiff that he was being placed on Absent Without Leave ("AWOL") status "until sufficient medical documentation [was] received by" the Sheriff's Office. (January 30 Letter.)[10] Plaintiff correctly points out that the January 30 Letter did not advise Plaintiff he was being placed on such status retroactive to January 17, 2015. (Pl.'s 56.1 Reply ¶ 81.) However, that Plaintiff only received the letter on January 30, 2015, and was not at that time told the status was retroactive to January 17, 2015, does not contradict the evidence Defendants marshal in support of their statement that Plaintiff's status was changed on January 23, 2015. At best, Plaintiff's statement raises a question about whether he was timely informed of the status change, which is not an outcome-determinative fact in any event.

Defendants state that Plaintiff was placed on LWOP based on his failure to report for duty as ordered and to provide adequate medical documentation. (Defs.' 56.1 ¶ 83 (citing Volpe Decl. ¶ 14; Fortunato Decl. ¶ 12.)[11] Plaintiff challenges this characterization, arguing that "Volpe never timely advised [P]laintiff that he deemed his medical note inadequate before placing [P]laintiff on AWOL status." (Pl.'s 56.1 Reply ¶ 83.) Plaintiff cites to Fortunato's testimony that Volpe should have notified Plaintiff that he was being placed on LWOP when his status changed. (Id. (citing Fortunato Dep. 48).) This too, however, at most shows that there is

---

[10] The Court notes that the January 30 Letter mentions that Plaintiff was placed on AWOL status, but does not expressly mention LWOP status. (January 30 Letter.) The Parties do not make clear whether Plaintiff was placed on LWOP and AWOL status at the same time or separately. The Parties also do not detail the consequences of being placed on each type of status. Volpe testified that officers who are placed on AWOL status do not get paid and do not earn accruals. (Pl.'s 56.1 Counter ¶ 15 (Volpe Dep. 53).)

[11] Plaintiff's 56.1 Counterstatement is disturbingly rife with mischaracterizations of, and incomplete and misleading citations to, the record. For example, Plaintiff states that "when a corrections officer states that s/he cannot come to work and his/her doctor indicates s/he is suffering from a psychiatric issue, this entitles him/her to use sick leave." (Pl.'s 56.1 Counter ¶ 15 (Volpe Dep. 20).) Plaintiff omits, however, that Volpe stated that this is the case only when it is "*documented* that there's a [psychiatric] problem." (Volpe Dep. 20 (emphasis added).)

evidence that Plaintiff was belatedly notified of his status change and the insufficiency of his January 15 Note.

Defendants state that on January 23, 2015, Volpe told Gilman of Plaintiff's LWOP status. (Defs.' 56.1 ¶ 84 (citing Volpe Decl. ¶ 14; Gilman Decl. ¶ 6, Gilman Record RC 836).) This is supported by Gilman's handwritten attendance records for Plaintiff, which also have an "LWOP" notation next to January 23, 2015. (Defs.' 56.1 ¶ 85 (citing Gilman Record RC 836).)[12]

On January 23, 2015, when Fortunato wrote his e-mail advising Volpe to place Plaintiff on LWOP, Fortunato did not know that Plaintiff had filed the EEOC Charge. (Defs.' 56.1 ¶ 86 (Fortunato Decl. ¶¶ 10, 13).)[13] On January 23, 2015, when Volpe placed Plaintiff on LWOP, Volpe did not know that Plaintiff had filed the EEOC Charge. (*Id.* ¶ 87 (Volpe Decl. ¶ 17).) On

---

[12] Plaintiff summarily denies that Volpe told Gilman of Plaintiff's changed status on January 23, 2015, arguing that "[t]here is no evidence of any such advice and a reasonable jury need not believe this account of events, particularly where Volpe did not advise [P]laintiff of his status until January 30, 2015." (Pl.'s 56.1 Reply ¶ 84.) Plaintiff cites to the January 30 Letter as proof that he was notified on that date. Plaintiff does not, however, point to any evidence to contravene that January 23, 2015 is the day on which Gilman learned of Plaintiff's status change.

Plaintiff also denies that Gilman noted Plaintiff's LWOP status on her attendance record on January 23, 2015, arguing that "[a] reasonable jury need not accept this testimony either from an interested county employee" in light of the January 30 Letter. (*Id.* ¶ 85.) Plaintiff again does not offer any contravening evidence to cast doubt on the authenticity of Gilman's records or of the veracity of her Declaration. He points to the January 30 Letter but fails to explain how that Letter undermined Defendants' claim that Gilman took contemporaneous notes of Plaintiff's status change on January 23, 2015.

[13] Plaintiff admits that Fortunato did not know Plaintiff had filed an EEOC charge at the time he sent the January 23, 2015, email but argues that "Fortunato was the county counsel in the county's various prior unsuccessful efforts to terminate [P]laintiff's employment featuring by then four failed sets of disciplinary charges," and cites to a portion of Volpe's deposition transcript that does not support this proposition. (Pl.'s 56.1 Reply ¶ 86 (citing Volpe Dep. 25–27).) Whether Fortunato was the County's counsel in previous proceedings also has no bearing on his knowledge of the EEOC charge on January 23, 2015 when he sent the email. The Court will not consider Plaintiff's unsupported counterstatement.

January 23, 2015, when Gilman marked Plaintiff as "LWOP" in her attendance records, Gilman did not know that Plaintiff had filed the EEOC Charge. (*Id*. ¶ 88 (Gilman Decl. ¶ 11).)[14]

### 7. Further Communications Regarding Plaintiff's Medical Documentation

On January 20, 2015, Volpe faxed medical forms to Dr. Notaristefano, including a cover letter asking her to complete and return the forms regarding her treatment of Plaintiff "ASAP." (Volpe Decl. ¶ 10, Ex. C ("January 20 Medical Forms Request").) By January 30, 2015, Dr. Notaristefano still had not returned the forms that Volpe faxed to her on January 20, 2015. (Defs.' 56.1 ¶ 90.)

In his Declaration, Fortunato stated that by January 30, 2015, he learned, and informed Volpe, that Dr. Notaristefano had been convicted in Southeastern Town Court, Putnam County, New York of criminal diversion of medications and prescriptions in 2009, and that on November 3, 2010, Dr. Notaristefano had been censured and reprimanded by the New York State Department of Health, fined $2,500, placed on probation for three years, and permanently precluded from prescribing, ordering, administering and dispensing controlled substances. (Fortunato Decl. ¶ 15, Ex. A ("Dr. Notaristefano Disciplinary Record").) During his deposition, however, Fortunato stated that he did not recall exactly when he did his research on Dr. Notaristefano, but believes he did it shortly after he received the January 15 Note, but clearly before January 30, 2015. (Fortunato Dep. 62–65.) Plaintiff correctly points out, however, that in that same portion of his testimony, Fortunato stated that he would have done his research on Dr.

---

[14] Plaintiff summarily denies Defendants' 56.1 Statement at ¶¶ 87–88, but fails to provide any supporting evidence. (Pl.'s 56.1 Reply ¶¶ 87–88.) The Court will not consider Plaintiff's unsupported counterstatement.

Notaristefano before January 23, 2015, and that that he "absolutely" would have advised Volpe of his research before that date. (Pl.'s 56.1 Reply ¶¶ 91–92 (citing Fortunato Dep. 64).)[15]

In his Declaration, Fortunato stated that, based on the "'under my care note' from a doctor with a criminal conviction . . . and Dr. Notaristefano's failure to respond to the request for confirmation of [P]laintiff's alleged disability, [Fortunato] felt that [P]laintiff's claim of an inability to return to work was highly suspicious." (Fortunato Decl. ¶ 16.) Fortunato further stated that he conveyed his opinion to Volpe and recommended that Volpe designate an independent medical examiner ("IME") to assess whether Plaintiff was able to perform his essential job functions and whether he was entitled to use sick leave. (*Id*.) During his deposition, Fortunato stated that he had a practice of memorializing in email conversations he had with his clients within the County, (Fortunato Dep. 14), but that there is no email from him to Volpe summarizing Fortunato's findings regarding Dr. Notaristefano's credentials, (*id*. at 66–67). Fortunato also testified that he was not aware of any contact between anyone from the County and Dr. Notaristefano between January 20, 2015, when the request for medical forms was sent to her, and January 30, 2015. (*Id*. 53–54.)

Article XII, § (5)(c) of the CBA between the County and COBARC, states, in part, "The Sheriff may . . . require the employee to be examined at the expense of the employer by a physician designated by the Sheriff." (Defs.' 56.1 ¶ 95.) Fortunato recommended that Volpe designate an IME to assess whether Plaintiff was able to perform his essential job functions. (*Id*. ¶ 96 (citing Fortunato Decl. ¶ l6; Volpe Decl. ¶ 20).) The January 30, 2015 Letter informed

---

[15] The Court cites directly to the record because the Parties disagree almost entirely about when Fortunato learned about Dr. Notaristefano's disciplinary record and when, why, and how he conveyed this information to Volpe. (Defs.' 56.1 ¶¶ 91–94; Pl.'s 56.1 Reply ¶¶ 91–94.) Plaintiff correctly points out that Fortunato's Declaration and deposition testimony are internally inconsistent at points. (Pl.'s 56.1 Reply ¶¶ 91–94.)

Plaintiff that he was to appear for such an IME. The Letter stated that the January 15 Note was unsatisfactory and Dr. Notaristefano had failed to respond to the County's request for further medical documentation. (January 30 Letter.) The January 30 Letter included copies of the County medical forms and stated that they should be filled out by Dr. Notaristefano and returned no later than February 6, 2015, and advised Plaintiff that he would be considered AWOL until the Sheriff's Office received sufficient medical documentation for his absence. (*Id*.) The January 30 Letter also directed Plaintiff to appear for an IME by a Dr. Frank Garigali, on February 6, 2015, to be examined to determine his fitness for duty. (*Id*.) Dr. Garigali was an internist. (Defs.' 56.1 ¶ 101.)

On January 31, 2015, the County received a fax from Dr. Notaristefano's office with the completed medical form ("January 31 Form"). (Defs.' 56.1 ¶ 103.) The January 31 Form stated that Plaintiff had been under Dr. Notaristefano's care for chronic "PTSD/depression" from September 9, 2013 through January 31, 2015. (*Id*. ¶ 104.) However, the Form did not explain how the chronic PTSD Plaintiff was experiencing at that time differed from his condition earlier in her treatment of him, when he was medically able to work at the Jail. (*Id*. ¶ 107.) The January 31 Form stated that Plaintiff was "on meds not recommended to handle guns—unable to perform his job." (Aff. of Frank Olivier ("Pl. Aff.") (Dkt. No. 75) Ex. 4 (Dr. Notaristefano's January 31, 2015 Form ("January 31 Form")).)[16]

Fortunato and Volpe stated that it was unclear to them whether the January 31 Form was a request for an accommodation relating to Plaintiff's gun, or a claim of disability from all of

_____

[16] The Parties dispute whether the meaning of the January 31 Form is clear. Defendants argue that the January 31 Form "did not address [P]laintiff's medical condition during the period January 17 [to] January 30, 2015." (Defs.' 56.1 ¶ 109.) Plaintiff counters that it did because it stated that Dr. Notaristefano saw Plaintiff on January 31, 2015 and that his condition was chronic. (Pl.'s 56.1 Reply ¶ 109.)

Plaintiff's job functions.  (Defs.' 56.1 ¶ 113 (citing Volpe Decl. ¶¶ 27, 29; Fortunato Decl. ¶¶ 24).)  Moreover, Fortunato and Volpe believed that Dr. Notaristefano, an internist, was not medically qualified to opine on Plaintiff's psychiatric condition or its impact on Plaintiff's ability to carry out his duties as a correctional officer.  (*Id*. ¶ 110 (citing Volpe Decl. ¶¶ 26, 28; Fortunato Decl. ¶ 19).)  Fortunato and Volpe stated that their belief that Plaintiff was not being honest about his medical condition was reinforced by "[t]he claim of a psychiatric disability by a doctor without the expertise to render such a diagnosis," "[Dr.] Notaristefano's failure to distinguish [P]laintiff's current status from when he was able to work, . . . [and her] failure to address [P]laintiff[']s status for the two weeks preceding the January 31 [F]orms."  (*Id*. ¶ 111 (citing Volpe Decl. ¶¶ 29–30; Fortunato Decl. ¶¶ 23–25).)[17]

Fortunato recommended that Volpe send Plaintiff for an IME by a psychiatrist rather than by Dr. Garigali.  (*Id*. ¶ 114 (citing Fortunato Decl. ¶ 25).)

On February 5, 2015, Volpe sent Plaintiff a letter ("Volpe's February 5 Letter") stating that he had received the supplemental paperwork from Dr. Notaristefano, but that it still provided no medical justification for Plaintiff's absence from work between January 17, 2015 and January 31, 2015, and that it was ambiguous as to the period from January 31, 2015 to the time Volpe wrote the letter.  (*Id*. ¶ 115.)  Volpe wrote that it was "unclear whether [Plaintiff was] completely

---

[17] Plaintiff denies Defendants' statements about Volpe and Fortunato's beliefs about Dr. Notaristefano's qualifications, arguing that Defendants intended to ignore whatever Plaintiff's doctors reported about his condition.  (Pl.'s 56.1 Reply ¶¶ 110–11 (citing Fortunato Dep. 75–76).)  However, the portion of Fortunato's deposition that Plaintiff cites does not support his proposition.  Fortunato states that once the Sheriff's Office noticed Plaintiff for an IME, it was bound by the finding of the IME.  (Fortunato Dep. 75–76.)  Whether Defendants would be bound by the IME's findings does not go to what Volpe and Fortunato believed about Dr. Notaristefano's qualifications.  Again, Plaintiff's 56.1 Reply violates Local Civil Rule 56 because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [defendant], without specifically controverting those facts."  *Pape*, 2013 WL 3929630, at *1 n.2.

unable to perform all of [his] essential job functions or whether [he was] able to work but require[d] some reasonable accommodation." (*Id*.) The February 5 Letter further stated that in accordance with Article XII Leave with Pay, § 5e of the COBARC CBA, "[t]he Sheriff in his discretion may require such proof of illness or disability as he may deem necessary. The Sheriff may also require the employee to be examined at the expense of the employer by a physician designated by the Sheriff." (*Id*.) The Letter further stated that Plaintiff's supplemental paperwork indicated the potential existence of medical conditions requiring evaluation by a specialist and that therefore Plaintiff's appointment with Dr. Garigali was cancelled, and that Plaintiff was directed to report to Dr. James W. Flax on February 13, 2015 for an IME. (*Id*.)

On February 5, 2015, Plaintiff responded to Volpe's January 30, 2015 letter. (Defs.' 56.1 ¶ 116.) In his Letter, Plaintiff protested the appointment of Dr. Garigali to render an IME because he had already provided a doctor's note, but stated that he would still attend the medical examination. (Volpe Decl. Ex. J (Pl.'s February 5, 2015 Letter to Volpe ("February 5 Letter")).) Plaintiff also stated that he had complied with Volpe's order by having Dr. Notaristefano complete and send back the medical forms in order to avoid sanctions. Plaintiff also stated that despite his compliance, he was placed on AWOL status and his medical benefits were stopped. (*Id*.) Plaintiff did not learn about this change of status until he went to the Jail to pick up his paychecks. Plaintiff stated that he was told that his "initial letter was sufficient." (*Id*.) He did not receive any paperwork until January 30, 2015. (*Id*.) Plaintiff also directed Defendants to "refrain from contacting [his] doctors(s) from this point forward" and stated that that he did not sign a medical release form allowing Defendants to contact his doctors. (*Id*.)

Volpe and Fortunato state in their Declarations that Plaintiff's instruction to not contact his doctors added to their belief that they needed an independent medical opinion. (Volpe Decl. ¶ 33; Fortunato Decl. ¶ 27.)

On February 9, 2015, the County received further forms from Dr. Notaristefano, dated February 7, 2015 ("February 7 Forms"). (Defs.' 56.1 ¶ 120.) The February 7 Forms stated that Plaintiff was suffering from "anxiety, PTSD, insomnia, suicidal thoughts, hearing voices," and that the estimated period of incapacity began on January 16, 2015. (Volpe Decl. Ex. K (February 7 Forms).) The February 7 Forms also indicated that Plaintiff had been referred to a psychiatrist, Dr. Sharma, and a behavioral therapist, Dr. Stak, but did not include any medical documentation from Dr. Sharma or Dr. Stak. (*Id.*)

### 8. Plaintiff's FMLA Leave

On February 9, 2015, Gilman and Volpe co-signed notices entitled "Notice of Eligibility for FMLA Leave and Rights and Responsibilities Notice" and "Notice of Designation of FMLA Leave." (Gilman Decl. ¶ 19, Ex. C ("FMLA Leave Notices").) The Notices informed Plaintiff that his request for unpaid FMLA leave had been approved, (FMLA Leave Notices 1–2), and that his health insurance would be maintained and extended during any FMLA leave, (*id.* at 5).[18] Kelly Lopez ("Lopez"), the Personnel Coordinator for Employee Benefits in the County Department of Personnel, (Decl. of Kelly Lopez ("Lopez Decl.") ¶ 2 (Dkt. No. 62)), stated in her

---

[18] Plaintiff denies that he was informed that his benefits were extended, (Pl.'s 56.1 Reply ¶¶ 125–26), but the form that he signed to acknowledge receipt of the FMLA Notice includes a provision, on the same page as Plaintiff's signature block, that expressly states that Plaintiff's health benefits would be maintained, (FMLA Leave Notices 5).

Declaration that employee benefits continue through the last full month of FMLA coverage for employees on FMLA leave, (*id.* ¶ 7).[19]

Volpe testified that he did not recall signing off on Plaintiff's FMLA leave request in early 2015. (Pl.'s 56.1 Counter ¶¶ 37–38 (citing Volpe Dep. 44).) Plaintiff acknowledged receipt of the FMLA Leave Notices on February 10, 2015. (Defs.' 56.1 ¶ 125.)

Gilman states in her Declaration that to finalize FMLA approval, the Commissioner of the County Department of Personnel must sign off on the FMLA application. (Gilman Decl. ¶ 24.) On March 2, 2015 County Personnel Commissioner Joan Silvestri ("Silvestri") approved Plaintiff's FMLA leave request. (Gilman Decl. Ex. D ("FMLA Request Form").) The Form lists the date on which Plaintiff's FMLA leave began as January 19, 2015, and the date on which it was set to end as April 12, 2015. (*Id.*)

Between March 2 and March 6, 2015, Gilman prepared her attendance records for the period February 21 through March 6, 2015. (Defs.' 56.1 ¶ 128.) Following Silvestri's final approval of Plaintiff's FMLA application, Gilman changed Plaintiff's status on his attendance record from "LWOP" to "FMLA'' for all dates from January 19, 2015 through February 18, 2015. (*Id.* ¶ 129.) Beginning with Gilman's entry for February 21, 2015, she entered Plaintiff's status as "FMLA." (*Id.* ¶ 130.)[20]

---

[19] Plaintiff denies that being placed on FMLA leave had the effect of extending his healthcare benefits, but only cites his own Declaration in which he denies having been informed that his benefits were extended. (Pl.'s 56.1 Reply ¶ 126 (citing Pl. Aff. ¶ 15).) Plaintiff ignores the FMLA Leave Notice that says that his benefits were extended, and points to no other evidence that his benefits were not in fact extended during his FMLA leave.

[20] Plaintiff denies that his FMLA leave was approved and argues that approval by the Sherriff was required. (Pl.'s 56.1 Reply ¶ 127.) Plaintiff cites to a portion of Fortunato's testimony in which Fortunato states that "the appointing authority" determines whether FMLA is approved by the County, and that in this case that person would be the Sheriff. (Fortunato Dep. 90.) Fortunato, however, also stated that he was not certain about whether any approval beyond

### 9.  Dr. Flax's Examination

On February 13, 2015, Plaintiff appeared for his IME with Dr. Flax.  (Defs.' 56.1 ¶ 131.) Fortunato testified that neither he nor Volpe requested any authorizations for releases of medical records from Plaintiff before this appointment.  (Pl.'s 56.1 Counter ¶ 42 (citing Fortunato Dep. 91–92).)  At a certain point in Dr. Flax's examination, Plaintiff stopped answering questions, stated that he would not reveal anything further, and told Dr. Flax, "I don't trust you," "the County is paying you," and "I told you more than I wanted to tell you."  (Defs.' 56.1 ¶ 132.)

The Parties contest what exactly was said and what information was shared during the appointment with Dr. Flax.  (Defs.' 56.1 ¶¶ 133–36; Pl.'s 56.1 Reply ¶¶ 133–36.)  Dr. Flax states in his Declaration that Plaintiff refused to provide medical records, and told Dr. Flax that he had filed a Worker's Compensation claim and that Dr. Flax "could get records from that."  (Decl. of Dr. James W. Flax ("Flax Decl.") ¶ 3 (Dkt. No. 58).)  Dr. Flax also stated that Plaintiff refused to provide information including details regarding his "psychiatric medication, education, work activities, past personal history, usual activities, and psychiatric and medical history," and that he "refused to take the Minnesota Multiphasic Personality Inventory (MMPI) test, which is a psychological test that assesses personality traits and psychopathology."  (*Id*.)  Dr. Flax could not complete the IME.  (*Id*.)

Plaintiff states in his Affirmation that during the February 13, 2015 IME, he did provide Dr. Flax information about his work activities, psychiatric medication, and psychiatric history,

---

the appointing authority was required, and that he was not sure whether the approval authority was delegated from the Sherriff to Volpe.  (*Id*. at 91.)  Fortunato also expressed that he was not sure about which FMLA policy was in effect during 2015.  (*Id*.)

Fortunato's lack of familiarity with the County's FMLA policy, and his statement that maybe the Sheriff approved the FMLA in Plaintiff's case or maybe delegated that approval authority, does not contradict the evidence Defendants submitted showing that Plaintiff's FMLA leave was approved and that Plaintiff was indeed placed on FMLA leave.

and with an authorization to obtain medical records from Nyack Hospital, New York Presbyterian Hospital, Stat Health, Parvesh Sharma, Howard Rombom, and Behavioral Medicine Associates. (Pl. Aff. ¶ 24.) Plaintiff states that he told Dr. Flax that he did not remember the names of all the medications he was taking, but he explained why he was taking them and what the effect of each was. (*Id*.) Plaintiff also states that he started to take the MMPI, but told Dr. Flax that he was too distracted and stressed to complete the test that day. (*Id*. ¶ 25.) Plaintiff checked into the inpatient unit at New York Presbyterian two days later and stayed there for eight days. (*Id*.)

On or about February 18, 2015, the County received a medical note ("February 18 Note") from Behavioral Medicine Associates stating that Plaintiff had been "under the care of Dr. Timothy Welles of Behavioral Medicine Associates for extended treatment," that he had chronic and recurring PTSD, and that he was "not able to return to work until July 1, 2015, provided his PTSD symptoms have decreased enough to allow him to perform his normal duties at that time." (Defs.' 56.1 ¶ 138.) The February 18 Note did not mention Plaintiff's ability to work prior to February 18, 2015. (*Id*. ¶ 139.)

Volpe states in his Declaration that he spoke with Fortunato about the February 18 Note and that Fortunato felt it failed to medically justify Plaintiff's absence from work or his use of paid sick leave, and that they should wait for Dr. Flax's opinion before allowing Plaintiff to use sick leave. (Volpe Decl. ¶ 37.) Fortunato states in his Declaration that, given that the February 18 Note was missing key information and that Plaintiff had not completed his IME with Dr. Flax, he felt that the County needed an independent medical opinion concerning Plaintiff's disability

before allowing him to use sick leave. (Fortunato Decl. ¶¶ 31–32.)[21] Fortunato testified that he and Volpe agreed to "stand in full" because Plaintiff failed to cooperate with the IME. (Pl.'s 56.1 Counter ¶ 55 (citing Fortunato Dep. 102).)

As of February 18, 2015, Plaintiff's IME with Dr. Flax was still not complete. (Defs.' 56.1 ¶ 144.) Dr. Flax states that on February 23, 2015, he spoke with Volpe and requested documentation concerning Plaintiff. (Flax Decl. ¶¶ 4–5.) Volpe states that on February 24, 2015, he spoke with Dr. Flax on the telephone and Dr. Flax advised him that Plaintiff had been uncooperative with Dr. Flax's attempts to conduct the IME. (Volpe Decl. ¶ 38.) According to Volpe, Dr. Flax stated that Plaintiff had refused to answer questions about his education and work activities, past personal history, usual activities, psychiatric and medical history. He also stated that he needed Plaintiff's relevant medical records. (*Id.*)[22]

Later on February 24, 2015, Volpe received an e-mail from Dr. Flax stating,

As we discussed on the phone this morning, [Plaintiff] was not fully cooperative with the examination. I have scanned the new documents you sent to me. There are multiple notes from different physicians. In order to provide any opinion regarding [Plaintiff] I need ALL medical records including those of Elaine

---

[21] Plaintiff disputes that Fortunato and Volpe had a conversation about the February 18 Note because although Volpe mentions such a conversation in his Declaration, Fortunato does not mention the conversation in his Declaration, and because there is no email memorializing the conversation. (Pl.'s 56.1 Reply ¶ 142.) Plaintiff does not, however, point to any evidence contradicting that such a conversation took place or that Volpe and Fortunato shared their thoughts on the February 18 Note with each other.

Plaintiff also disputes Fortunato's reaction to the February 18 Note, again arguing that there was no email correspondence about the February 18 Note, and citing a portion of Fortunato's deposition testimony in which Fortunato stated that once Defendants ordered an IME, there would be no further point in receiving clarification from Plaintiff's doctors because they would be bound by the IME. (Pl.'s 56.1 Reply ¶ 143.) That Fortunato believed they would be bound by the IME, does not mean that Fortunato and Volpe did not discuss the February 18 Note and its adequacy. The Court will thus not consider Plaintiff's unsupported counterstatement.

[22] It is not clear from the evidence whether this call occurred on February 23 or 24, 2015, or whether there were multiple calls.

Zimmerman, Dr. Jean Jacques, the psychiatric consultation at Nyack Hospital 8/29/1997 to 9/3/1997 and from all those who have written notes regarding his being out of work or returning to work . . . .

In addition, I require [Plaintiff's] full cooperation in the examination including providing information regarding his education & work activities, past personal history, usual activities, psychiatric & medical history and any other line of inquiry I find relevant to pursue. In addition I require [Plaintiff's] full cooperation in any psychological or psychiatric testing I deem necessary. This would require that he return to my office on a date or dates to be determined.

(Defs.' 56.1 ¶ 149.)

During Volpe's tenure as Chief, he had never before received a complaint from an independent medical examiner stating that an employee refused to cooperate. (Defs.' 56.1 ¶ 150.) Volpe spoke with Fortunato, who stated that Plaintiff should not be able to obstruct the County's contractually demanded IME while simultaneously receiving paid sick leave. (*Id*. ¶ 151.) Based on Dr. Flax's report that Plaintiff had not cooperated, Volpe and Fortunato continued to question the veracity of Plaintiff's disability claim and continued to feel that an independent medical opinion was necessary. (*Id*. ¶ 152 (citing Volpe Decl. ¶ 41; Fortunato Decl. ¶ 34).)

However, Fortunato also testified that he was not aware whether anyone from the County had communicated the demands for medical authorizations to Plaintiff prior to February 24, 2015, and he does not recall telling Volpe that he should contact Plaintiff to ask him to complete such authorizations. (Pl.'s Counter ¶¶ 71, 75 (citing Fortunato Dep. 112, 115).) Plaintiff's counsel states in his Affirmation that the "County has produced no communication, either from Dr. Flax, Chief Volpe, or Mr. Fortunato requesting that [P]laintiff provide any medical records or

authorizations for release of medical records in February and March 2015." (Pl.'s Counter ¶ 73 (citing Sussman Aff. ¶ 3).)[23]

On March 5, 2015, COBARC filed a grievance for Plaintiff, contending violations of the CBA by the County in its treatment of Plaintiff's sick leave. (Pl.'s Counter ¶ 78 (citing Pl. Aff. ¶ 30, Ex. 11 (COBARC March 5, 2015 Grievance Form)).)

On March 12, 2015, Fortunato spoke with Plaintiff's union attorney, Julie Schatz ("Schatz"). (Defs.' 56.1 ¶ 153.) During this conversation, Fortunato told Schatz that Plaintiff was being "uncooperative and obstructing the County's attempt to conduct an IME." (*Id.* ¶ 154 (quoting Fortunato Decl. ¶ 35).) Volpe states in his Declaration that by this point, Plaintiff had asked to use his sick leave. (Pl.'s 56.1 Counter ¶ 82 (citing Volpe Decl. ¶ 44).)

On March 13, 2015, Volpe received a note dated March 12, 2015 ("March 12 Note") from Behavioral Medicine Associates, stating that Plaintiff had "been under the care of Dr. Timothy Welles of Behavioral Medicine Associates for extended treatment" and that he has a diagnosis of chronic and recurring PTSD. (Defs.' 56.1 ¶ 156.) The Note further states that "[s]ince January 17, 2015 [Plaintiff] has not been able to return to work. He is currently psychologically disabled and not able to perform his normal duties as a correction officer at this time." (*Id.*)

Volpe passed the March 12 Note along to Fortunato to seek his advice. (*Id.* ¶ 157.) On March 13, 2015, Fortunato sent Volpe an e-mail stating that the March 12 Note was "arguably sufficient to cover [Plaintiff's] absence since 1/17. It also confirms a psychiatric disability

---

[23] It is true that there are no letters or emails to Plaintiff in the record showing that the request for medical authorizations was sent to Plaintiff. The Court notes, however, that Dr. Flax states in his Declaration that he contacted Plaintiff several times in February and March 2015 about the need for medical authorizations. (Flax Decl. ¶¶ 3, 8–9.)

thereby justifying your designation of Dr. Flax to do the County IME." (*Id.* ¶ 158.)  Fortunato

further stated that "sick leave use should not be approved until we have an opinion from Dr.

Flax.  [Plaintiff] cannot obstruct our IME and demand sick leave at the same time," and that he

had spoken to Schatz and that she promised she would speak to Plaintiff to get him to cooperate.

(*Id.*)  Based on Fortunato's advice and the reports of Plaintiff's failure to cooperate with Dr.

Flax, Volpe did not change Plaintiff's LWOP status.  (*Id.* ¶ 159.)

On March 18, 2015, Volpe emailed Dr. Flax and asked whether he had received any of

the requested documentation from Plaintiff.  (Fortunato Decl. Ex. B (March 18, 2015 Emails

between Dr. Flax, Volpe, Fortunato, and Schatz ("March 18 Emails") 5.)  Dr. Flax replied that as

of March 17, 2015 he had not received anything from or about Plaintiff other than the documents

Volpe had sent him in the past.  (*Id.*)  Volpe forwarded Dr. Flax's e-mail to Fortunato.  (*Id.*)

Fortunato forwarded Dr. Flax's e-mail to Schatz and advised her that if Plaintiff did not fully

comply with Dr. Flax by March 20, 2015, Plaintiff would be formally charged with obstruction

of an IME pursuant to Article XII, § 5(f) of the COBARC CBA.  (March 18 Emails 2.)

Fortunato also advised that, "the Flax IME was required by the Sheriff in accordance with

Article XII, Section 5(e) of the COBARC contract.  Accordingly [Plaintiff] will not be permitted

to use any sick leave accruals pending a completion of the IME and a determination of the

Sheriff based upon a report from Dr. Flax."  (*Id.*)

On March 19, 2015, Schatz responded to Fortunato via e-mail, stating that it was her

understanding "that the Union spoke directly with [Plaintiff] about compliance on Monday.  He

has been instructed to provide all of the requested documentation immediately.  He has indicated

to the Union that he will do so."  (Defs.' 56.1 ¶ 164.)

On March 19, 2015, Dr. Flax received a voicemail from Plaintiff asking Dr. Flax to call him to arrange for the release of Plaintiff's records. (Defs.' 56.1 ¶ 165.) On March 19, 2015, a woman identifying herself as a friend of Plaintiff called Dr. Flax to make an appointment for him. (*Id.* ¶ 166.) Dr. Flax updated Volpe regarding the status of the arrangements for Plaintiff's medical records and appointment. (*Id.* ¶ 167.)

On March 20, 2015, Dr. Flax left a voicemail message for Plaintiff stating that he could arrange for the records to go to Dr. Flax directly and then make an appointment with Dr. Flax. (*Id.* ¶ 168.) On March 27, 2015, Dr. Flax spoke with Plaintiff and Plaintiff requested time to drop off medical records and sign a release for a doctor to provide Dr. Flax with other records. (*Id.* ¶ 169.)[24]

On March 30, 2015, Plaintiff delivered medical records to Dr. Flax's office. (Defs.' 56.1 ¶ 170.) Dr. Flax describes these records as "partial." (Flax Decl. ¶ 10.) Plaintiff, however, states that he delivered all his medical records in his possession to Dr. Flax. (Pl. Aff. ¶ 34.)

On March 30, 2015, Plaintiff also signed an authorization permitting Dr. Flax to obtain the records of Plaintiff's psychiatrist, Dr. Sharma. (Defs.' 56.1 ¶ 171.) On March 31, 2015, Dr. Flax left Plaintiff a voicemail message asking him to identify the New York Presbyterian Hospital at which he had been. (*Id.* ¶ 172.) That same day Plaintiff called Dr. Flax back to inform him he had been at the White Plains location. (*Id.* ¶ 173.)

On April 1, 2015, Dr. Flax emailed Volpe that Plaintiff "brought very partial records and signed releases for me to request records from the treating psychiatrist and from the two

---

[24] In his 56.1 Reply, Plaintiff admits to the March 20 and March 27, 2015 communications between Plaintiff and Dr. Flax. (Pl.'s 56.1 Reply ¶¶ 168–69.) However, in his Counterstatement, Plaintiff summarily and incorrectly states that Dr. Flax's Declaration makes no mention of contact between Dr. Flax and Plaintiff, (Pl.'s Counter ¶ 57), when Dr. Flax's Declaration in fact expressly mentions his contacts with Plaintiff, (Flax. Decl. ¶¶ 8–9).

providers of the partial records on Monday, 3/30." (Volpe Decl. Ex. P at 2 (April 1 to 8, 2015 Emails between Dr. Flax and Volpe ("April 1 to 8 Emails")).) On April 7, 2015, Dr. Flax emailed Volpe that he had received some records regarding Plaintiff, others were still outstanding, and that Plaintiff was supposed to return to Dr. Flax's office to sign additional authorizations. (Defs.' 56.1 ¶ 175.) Dr. Flax also told Volpe that Plaintiff would schedule a follow-up examination for the following week to attempt to complete the IME. (*Id.* ¶ 176.)

On April 8, 2015, Schatz emailed Fortunato to ask for a status update regarding "what [was] going on with Dr. Flax." (Fortunato Decl. Ex. C at 2–3 (April 8, 2015 Email Exchange Between Jeffrey Fortunato and Julie Schatz ("April 8 Email")).) Schultz wrote that Plaintiff had called her and told her he brought the required records and releases to Dr. Flax the previous week, and also conveyed that at that point he was "on the verge of being evicted" and hoped the County would "allow him to use his accrued time now that he has made a good faith attempt at compliance and is awaiting further instructions from the County." (*Id.*)

On April 8, 2015, Fortunato forwarded Dr. Flax's April 7 e-mail to Schatz, adding that one of the authorizations Plaintiff had provided to Dr. Flax was not signed, and that the IME would be scheduled "notwithstanding that [Plaintiff] has not provided the other requested documentation." (Defs.' 56.1 ¶ 177.) Fortunato added that permitting Plaintiff to "use accruals without proper documentation, aside from violating the contract, will not increase [Plaintiff's] willingness to cooperate with the IME." (*Id.*) Fortunato further wrote that Plaintiff continued to "obstruct the IME process by not complying in good faith," and that "without [Plaintiff's] obstruction, the IME would have been completed in early February. Half measure[] actions which wrongfully put the onus on the doctor don't cut it." (*Id.*) Fortunato concluded that if

necessary Plaintiff should personally obtain "his records from his providers, deliver[] them to Dr. Flax and do[] everything else humanly possible to complete the exam." (*Id*.)

When Fortunato sent the April 8 Email to Schatz, Fortunato did not know whether Plaintiff actually had the relevant records in his possession and was refusing to hand them over. (Pl.'s 56.1 Counter ¶ 98 (citing Fortunato Dep. 135).) Moreover, although Fortunato stated that Plaintiff should not be allowed to use his accruals, Volpe testified that an employee on FMLA leave had the option to exhaust his or her accruals. (Pl.'s 56.1 Counter ¶ 40 (citing Volpe Dep. 66).)

On April 9, 2015, Plaintiff came to Dr. Flax's office and started taking the MMPI again. Plaintiff sat for ninety minutes but then left without finishing the test. (Defs.' 56.1 ¶ 178.) According to Dr. Flax, Plaintiff left after saying that he could not finish because "he did not know who the people in the waiting room were and he was feeling anxious and nervous." (Flax Decl. ¶ 14.) Ultimately, however, on April 14, 2015, Plaintiff returned to Dr. Flax's office and completed the MMPI. (Defs.' 56.1 ¶ 180.)

As of April 14, 2015, there were still various medical records that had not been provided. (*Id*. ¶ 181.)[25] On April 15, 2015, Plaintiff called Dr. Flax's cell phone to state that he was trying to get some of the outstanding medical records. (*Id*. ¶ 182.) On April 17, 2015, Dr. Flax spoke with Volpe and told him that he was awaiting medical records and test results. (*Id*. ¶ 183.) On April 17, 2015, Dr. Flax received records from Dr. Rombom's office, but they were limited to three evaluation reports and no treatment records. (*Id*. ¶ 184.) Dr. Flax states in his Declaration

---

[25] Plaintiff denies that there were still outstanding medical records as of April 14, 2015, (Pl.'s 56.1 Reply ¶ 181), but then admits several subsequent statements in Defendants' 56.1 Statement that describe Plaintiff's further efforts at obtaining his medical records, (*id*. ¶¶ 182–83).

that he called Dr. Rombom's office to ask for the remainder of the records, he was told that the office did not have authority to give him the treatment records. (*Id*. ¶ 185.) Plaintiff denies this statement and counters that he provided unrestricted authorization for Dr. Rombom's records. (Pl. Aff. ¶ 38.)

On April 23, 2015, Plaintiff signed an authorization permitting Dr. Flax to obtain Dr. Notaristefano's records. (Defs.' 56.1 ¶ 186.) On April 29, 2015, Dr. Flax advised Volpe that he was still missing Plaintiff's medical records from Dr. Sharma and New York Hospital, and Plaintiff's Social Security Disability file. (*Id*. ¶ 187.) Dr. Flax asked that the County Attorney intervene to obtain the outstanding medical records. (*Id*. ¶ 188 (citing Flax Decl. ¶ 19; Volpe Decl. ¶ 53).)

On May 6, 2015, Fortunato received an e-mail from Dr. Flax stating that he still had not received medical records from some of Plaintiff's medical providers, including records from Dr. Notaristefano, Dr. Sharma, and Plaintiff's Social Security Disability file. (Fortunato Decl. Ex. D at 4 (May 6, 2015 Email from Dr. Flax to Fortunato ("May 6 Email")).) In that same email, Dr. Flax stated that staff in Dr. Notaristefano's office told him that the records would be sent to him pending "authorization from [Plaintiff] and clearance by the MD." (*Id*.) Plaintiff denies that he had not provided authorization for the records from Dr. Notaristefano's office by May 6, 2015. Plaintiff states in his Affirmation that he provided Dr. Flax such authorization on April 23, 2015. (Pl.'s 56.1 Reply ¶ 190 (citing Pl. Aff. ¶ 39).)

On May 7, 2015, Fortunato emailed Schatz, stating that Plaintiff continued to obstruct the IME by refusing to provide records from his treating psychiatrists and relating to the Social Security Disability Benefits Plaintiff was allegedly receiving. (Defs.' 56.1 ¶ 191.) Fortunato further wrote that if Plaintiff did not immediately provide the required records to Dr. Flax such

that the IME could be completed, Fortunato would recommend that the Sherriff commence disciplinary action to terminate Plaintiff's employment. (*Id.*)[26] Plaintiff denies the contents of this email are true. Plaintiff states that he provided authorization for the release of documents from Dr. Sharma's office on March 30, 2015, (Pl.'s 56.1 Reply ¶ 191), and Defendants admit as much elsewhere in their 56.1 Statement, (Defs.' 56.1 ¶ 171). On May 7, 2015, Schatz responded, "I am forwarding this information to the Union." (*Id.* ¶ 192.)

On May 13, 2015, Plaintiff came to Dr. Flax's office with the COBARC President to provide medical records from Dr. Notaristefano and Dr. Sharma. (*Id.* ¶ 193). Plaintiff and the Union President did not provide Dr. Flax with copies of Plaintiff's Social Security Disability records. (*Id.* ¶ 194.) Plaintiff states in his Affirmation that he did not possess the Social Security Disability records and had not been asked for an authorization for them by Dr. Flax. (Pl.'s 56.1 Reply ¶ 194 (citing Pl. Aff. ¶ 40).)

On May 13, 2015, Schatz e-mailed Fortunato stating that she had been advised that Plaintiff had provided all requested documentation to Dr. Flax as of that day and that the Union President went with Plaintiff to ensure there were no further miscommunications. (Defs.' 56.1 ¶ 195.)

Later that day, when Fortunato contacted Dr. Flax to confirm Schatz's representations, Dr. Flax stated that he had still not received Plaintiff's Social Security Disability records. (*Id.* ¶ 196.) On May 26, 2015, Dr. Flax spoke with Fortunato and they agreed that Flax should proceed without the Social Security Disability records. (*Id.* ¶ 197 (citing Fortunato Decl. ¶ 48; Flax Decl. ¶ 21).) Flax completed his report on June 1, 2015. (*Id.* ¶ 198.)

---

[26] Ultimately, Volpe did not initiate disciplinary charges against Plaintiff related to his failure to timely provide medical records documenting his illness. (Pl.'s 56.1 Counter ¶ 18 (citing Volpe Dep. 61).)

On or about June 4, 2015 Volpe received Dr. Flax's report. (*Id*. ¶ 199.) Dr. Flax opined that "[t]here is absolutely no question that [Plaintiff] is deliberately attempting to communicate that he is more disturbed than he actually is. This is consistent with someone who is malingering or exaggerating symptoms." (*Id*. ¶ 200.) Dr. Flax opined that plaintiff did not have PTSD, and that in spite of Plaintiff's "effort to exaggerate symptoms, [Dr. Flax's] impression based upon the entirety of his history and presentation is that he does have a condition that renders him unfit to work as a corrections officer." (*Id*. ¶¶ 201–02.) However, Dr. Flax determined that "[t]he record is clear that he has had paranoia and delusions that are becoming more pronounced over the years. These are considered psychotic symptoms." (*Id*. ¶ 203.) Dr. Flax diagnosed Plaintiff with a General Personality Disorder and Unspecified Psychotic Disorder that prevented him from working as a corrections officer. (*Id*. ¶ 204.) Dr. Flax concluded that Plaintiff's "conditions, independently or together, including his repeated efforts to exaggerate the severity of his condition, render him unable to consistently deal courteously and firmly with inmates, supervisors or colleagues; unable to consistently relate and deal with inmates during emotional stress and physical altercations; unable to consistently understand and carry out written and oral instructions." (*Id*.)

Volpe testified that he did not have a conversation with Dr. Flax about the report or read the entire report. (Pl.'s 56.1 Counter ¶¶ 104–05 (citing Volpe Dep. 18).)

### 10. Termination of Plaintiff's Health Insurance

As of April 8, 2015, Plaintiff was still on unpaid FMLA leave and had health insurance. (Defs.' 56.1 ¶ 206 (citing Lopez Decl. ¶¶ 8–10).) The last day of Plaintiff's FMLA leave was April 8, 2015. (*Id*. ¶ 207 (citing Gilman Decl. ¶¶ 20, 24, 32, 33; Gilman Record RC 836–37;

Lopez Decl. ¶ 11, Ex. A (April 23, 2015 Termination Notice Letter from Kelly Lopez to Frank Olivier ("April 23 Termination Notice")).)[27]

Upon the expiration of Plaintiff's FMLA status on April 8, 2015, he was placed on LWOP status. (Defs.' 56.1 ¶ 208 (citing Gilman Decl. ¶ 34; Gilman Records RC 836–837).) Defendants state that Plaintiff was "off payroll" beginning on April 9, 2015. (Defs.' 56.1 ¶ 209 (citing Lopez Decl. ¶ 11; April 23 Termination Notice; Gilman Decl. ¶ 34).) As of April 10, 2015, Plaintiff had 104 hours of sick leave, 187.75 hours of vacation leave, and 32 hours of personal leave. (Defs.' 56.1 ¶ 210 (citing Gilman Decl. ¶¶ 28–30, Ex. F (April 14, 2015 Letter from Capricia Gilman to Frank Olivier ("April 14 Letter")).) However, as of April 13, 2015, Plaintiff still had not finished taking the MMPI test with Dr. Flax, (Defs.' 56.1 ¶ 211), and Dr. Flax had not received all the records he had requested, (Flax. Decl. ¶¶ 15–21).

The County's policy at the time was, and still is, that if an employee is off payroll for more than 15 days in any given month, that employee is responsible for reimbursing the County for that month's pro-rated health, dental, and vision premiums. (Defs.' 56.1 ¶ 214 (citing Gilman Decl. ¶ 22; Lopez Decl. ¶¶ 6–7, 11; April 23 Termination Notice).) Under this policy, an

---

[27] The Court notes that Gilman states in her Declaration that the end date of Plaintiff's FMLA leave was changed from April 8 to April 12, 2015 on the finalized FMLA leave approval form. (Gilman Decl. ¶¶ 24, 32.) The April 23 Termination Notice states that Plaintiff's FMLA coverage lasted until April 8, 2015. (April 23 Termination Notice.) Because Defendants submitted competing evidence, it is unclear whether April 8 or April 12 was the end date of Plaintiff's FMLA leave.

Plaintiff denies that either of those dates is relevant, arguing that he understood that he did not have insurance benefits as of January 17, 2015, when he was declared AWOL. (Pl.'s 56.1 Reply ¶¶ 206–08.) However, the Court already explained in *supra* notes 18–19 that Plaintiff signed a notice that stated that his health benefits would continue, and in any event, Plaintiff's understanding of whether his benefits continued has no bearing on whether they actually did. Defendants submit evidence that supports their account of when Plaintiff's status changed and when his benefits were terminated. The Court will not consider Plaintiff's unsupported counterstatements.

employee's benefits are terminated if the employee fails to pay the pro-rated premiums. (*Id.* ¶ 215 (citing Gilman Decl. ¶ 22; Lopez Decl. ¶¶ 6, 11; April 23 Termination Notice).)

On April 23, 2015, County Benefits Specialist Kelly Lopez wrote Plaintiff a letter informing him that because he was off payroll for more than fifteen days in April 2015, his benefits, including health insurance, would be terminated if he did not pay the pro-rated premium for April 2015. (April 23 Termination Notice.)

Plaintiff did not pay the pro-rated premium for April 2015. (Defs.' 56.1 ¶ 217.) On May 5, 2015, Lopez processed the termination of Plaintiff's benefits effective March 31, 2015. (*Id.* ¶ 218.) Plaintiff alleges that "[t]he lengthy denial of income" he experienced during this period, "exacerbated [his] mental health crisis." (Pl.'s 56.1 Counter ¶ 101 (citing Pl. Aff. ¶ 49).)

### 11. Payment of Plaintiff's Accrued Leave

Gilman states in her Declaration that in early June 2015 she received notice that Plaintiff was permitted or could use his accrued leave. She then spoke to Plaintiff on the telephone and he stated that he wanted to receive payment for his FMLA leave. (Gilman Decl. ¶ 35.) According to Gilman, because "Plaintiff's FMLA leave had already expired, this would involve retroactively applying his vacation and sick leave to the period that he was on FMLA leave and issuing him a lump sum payment for that accrued leave." (*Id.*) According to Plaintiff's instructions, Gilman retroactively applied Plaintiff's vacation hours and sick leave to run concurrently with his FMLA Leave. (*Id.* ¶ 36.) "Applying Plaintiff's accrued leave beginning on January 19, 2015 resulted in the expiration of his vacation and sick leave on March 21, 2015." (*Id.*)[28]

---

[28] Plaintiff categorically denies Defendants' description of how Plaintiff was ultimately paid a lump sum payment for his accrued leave by arguing that he was not allowed to use his accrued leave during his FMLA leave, despite his request for paid leave. (*See* Defs.' 56.1

On June 12, 2015, the County issued Plaintiff a lump-sum payment of $14,566.36 for the accrued leave that was retroactively applied during Plaintiff's FMLA leave. (Defs.' 56.1 ¶ 222.) Plaintiff was later issued payment for his 32 hours of personal leave. (*Id.* ¶ 223.) Plaintiff has been issued payment for all of his accrued vacation, sick leave and personal leave. (*Id.* ¶ 224.)

### 12. Worker's Compensation and G.M.L. § 207-c Benefits

On February 4, 2015, Plaintiff's attorneys filed a Worker's Compensation C-3 ("Plaintiff's C-3") claim form on his behalf. (Defs.' 56.1 ¶ 225.) Plaintiff's C-3 claimed a "date of injury or date of onset of illness," specifically onset of PTSD, of June 26, 2013. (*Id.* ¶¶ 226–27.)[29] Plaintiff's C-3 stated that the "illness/injury happen[ed]" when "on 6/23/13 claimant was assigned the unit of an inmate of which has a long history with claimant . . . [Sostre] got other inmates to help with daily harassment." (*Id.* ¶ 229.) The June 2013 exposure to Sostre did not involve a physical assault on Plaintiff, (*id.* ¶ 230), and the aggravation of Plaintiff's PTSD was not caused by a physical assault, (*id.* ¶ 232).

Plaintiff did not file for General Municipal Law ("G.M.L.") § 207-c benefits in connection with the June 2013 exposure to Sostre. (*Id.* ¶ 233.) Nor did Plaintiff apply for or receive G.M.L. § 207-c benefits in 2015 or 2016. (*Id.* ¶¶ 234–35.)

### 13. Termination of Plaintiff's Employment

As of December 21, 2015, Plaintiff had still not returned to work. (Defs.' 56.1 ¶ 236.) On December 21, 2015, Volpe sent Plaintiff a letter ("December 21 Letter") citing Civil Service

---

¶¶ 219–21; Pl.'s 56.1 Reply ¶¶ 219–21.) Whether Plaintiff was allowed to use his accrued leave during his FMLA leave does not change when and whether Plaintiff was ultimately paid a lump sum.

[29] June 26, 2013 was the same day that Plaintiff was suspended for performing a magic trick with an inmate. (Defs.' 56.1 ¶ 228.)

Law ("C.S.L.") § 73 and stating that, because Plaintiff would be out of work for more than one consecutive year as of January 17, 2016, his employment would be terminated if he failed to return to work by that date. (*Id.* ¶ 237.)

On December 29, 2015, Plaintiff wrote a response letter stating that C.S.L. § 73 did not control because a Worker's Compensation judge had held his PTSD to be work-related and stemming from the June 2013 exposure to Sostre. (*Id.* ¶ 238.)

On January 8, 2016, the County sent Plaintiff a notice pursuant to §73 stating that his employment would be terminated unless he returned to work by February 8, 2016. (*Id.* ¶ 239.) On February 8, 2016, Plaintiff still had not returned to work. (*Id.* ¶ 240.)

On February 9, 2016, Volpe sent Plaintiff two letters—one pursuant to C.S.L. §71 (occupational injury provision) and one pursuant to C.S.L. §73 (ordinary disability provision)— informing him that his employment was terminated effective February 8, 2016 ("February 8 Termination Notices"). (*Id.* ¶ 241.) The Termination Notices informed Plaintiff that he had the right to seek reinstatement within one year of the termination of his disability. (*Id.* ¶ 242.)

In his Declaration, Volpe states that he sent Plaintiff dual notices because the Worker's Compensation finding of a work-related injury was under appeal and it was unclear whether the injury would ultimately be determined to be work-related or not, but that he understood that under either § 71 or § 73 Plaintiff had been out of work for the requisite amount of time. (*Id.* ¶ 243 (citing Volpe Decl. ¶ 66; Fortunato Decl. ¶ 56).) Volpe testified that he had not terminated any other employee under both sections. (Pl.'s 56.1 Counter ¶¶ 112–13 (citing Volpe Dep. 80).)

At the time of Plaintiff's termination he was not receiving § 207-c benefits. (Defs.' 56.1 ¶ 244.) Plaintiff's position was not abolished. (*Id.* ¶ 245.)

### 14. Plaintiff's Disability Retirement

Plaintiff did not seek reinstatement. (Defs.' 56.1 ¶ 246.) On October 13, 2016, Plaintiff applied for an Article 15 Disability Retirement. (*Id.* ¶ 247.) On December 20, 2017, Plaintiff received an Article 15 Disability Retirement from the New York State and Local Employees Retirement System. (*Id.* ¶ 248.) The Disability Retirement Notice stated that Plaintiff is "permanently incapacitated for the performance of his duties." (*Id.* ¶ 249.)

### 15. Similarly Situated Comparators

#### a. Officer Langer

Plaintiff was not the only officer who Volpe terminated pursuant to C.S.L. § 71. (Defs.' 56.1 ¶ 250.) On October 20, 2014, Volpe served C.O. Peter Langer ("Langer") with a C.S.L. § 71 warning letter (the "Langer Warning Letter"). (*Id.* ¶ 251.) The Langer Warning Letter stated in part that Langer had been absent from work for one year because of an occupational injury or diseases, that he was unable to return, and that he would be terminated from his position effective December 4, 2014. (*Id.* ¶ 252.)

As of November 4, 2014 Langer had not returned to work and Volpe served Langer with a C.S.L. § 71 termination letter (the "Langer Termination Letter"). (*Id.* ¶ 253.) The Langer Termination Langer stated in part that the County had not yet heard from Langer and that Langer's employment would be terminated effective December 4, 2014. (*Id.* ¶ 254.) On December 5, 2014 Langer's employment was terminated pursuant to C.S.L. § 71. (*Id.* ¶ 255.)

At the time that Volpe issued the Langer Warning Letter and Langer Termination Letter, Langer was not receiving G.M.L. § 207-c benefits. (*Id.* ¶ 256.) Throughout Volpe's tenure as Chief, Langer and Plaintiff were the only Jail employees who were absent for either a consecutive year or a cumulative year who were not receiving G.M.L. § 207-c benefits. (*Id.*

¶ 257.)  Volpe and Fortunato are not aware of Langer ever filing an EEOC charge or engaging in legally protected conduct against the County.  (*Id.* ¶¶ 258–59.)

### b. Other Officers

During Volpe's tenure as Chief, the only Jail employees who were out of work for one year due to a job-related disability were Plaintiff, Langer, C.O. Peter Orlando, C.O. Clare Jones and Sgt. Maureen Cawley.  (Defs.' 56.1 ¶ 265.)[30]

Orlando, Jones, and Cawley all were receiving § 207-c benefits.  (*Id.* ¶ 267.)  Orlando had filed a complaint against Volpe with the Rockland County Office of Employee Rights and Relations, a division of the Department of Personnel, claiming that Orlando was not promoted to sergeant because he was a white male.  (*Id.* ¶ 268.)

Neither Plaintiff nor Langer was receiving § 207-c benefits.  (*Id.* ¶ 266.)  During Volpe's tenure as Chief, Langer and Plaintiff were the only officers who were absent for either a consecutive year or a cumulative year who were not receiving G.M.L § 207-c benefits.  (*Id.* ¶ 272.)

Volpe did not terminate Orlando, Jones or Cawley's employment because they were receiving § 207-c benefits and because terminating them would have ensured that the County would have to pay their salaries with no prospect of ever receiving work in return.  (*Id.* ¶¶ 269–

---

[30] An officer injured in the line of duty may apply to the County for benefits pursuant to G.M.L § 207-c.  (Defs.' 56.1 ¶ 260.)  The County of Rockland is self-insured for purposes of G.M.L. § 207-c claims.  (*Id.* ¶ 261.)  If an officer receiving G.M.L. § 207-c benefits is terminated pursuant to C.S.L. §§ 71 or 73, the County remains responsible for paying the officer's salary after the termination.  (*Id.* ¶ 262.)  If an officer who is receiving Worker's Compensation benefits, but not G.M.L. § 207-c benefits, is terminated pursuant to C.S.L. §§ 71 or 73, the County is not obligated to continue paying that officer's salary and can hire a new officer.  (*Id.* ¶ 263.)  Volpe never terminated any employees who were receiving § 207-c benefits, even if they were out of work for more than one year.  (*Id.* ¶ 265.)  Fortunato recommended to the County administrators with whom he worked that they not terminate employees receiving § 207-c benefits, even if they were out of work for more than a year.  (*Id.* ¶ 264.)

70.)  Because Langer and Plaintiff were not receiving § 207-c benefits, by terminating them

pursuant to the Civil Service Law after they were absent from work for one year, the County was

able to save payment of their salaries, hire new officers, and avoid paying other officers'

overtime to cover Langer and Plaintiff's duties.  (*Id.* ¶ 271.)

In response to Defendants' interrogatories, and during his deposition Plaintiff named

several additional individuals he claimed were similarly situated to him, (*id.* ¶¶ 273–74), but

testified that he had no firsthand information regarding how any of these officers were treated

regarding use of sick leave or FMLA leave, and based his belief on hearsay and his suspicion,

(*id*. ¶¶ 275–76).  Plaintiff testified that he does not know whether or not any of the officers he

named received § 207-c benefits, Worker's Compensation benefits, or both.  (*Id.* ¶ 278.)[31]

B.  Procedural History

Plaintiff filed his initial Complaint on October 22, 2015.  (Compl. (Dkt. No. 1).)

Defendants filed their first motion to dismiss and accompanying papers on March 1, 2016.  (Dkt.

Nos. 19–21.)  Plaintiff filed his opposition on April 1, 2016.  (Dkt. No. 22.)  On March 8, 2017,

the Court issued an Opinion and Order granting Defendants' motion to dismiss the Complaint

with respect to those claims related to acts occurring before January 21, 2014.  (*See* March 8,

2017 Opinion & Order ("March 2017 Opinion") 18 (Dkt. No. 28).)  The Court's dismissal was

without prejudice and provided Plaintiff 30 days to file an Amended Complaint.  (*Id*.)  The Court

construed Plaintiff's claim as being one for disparate treatment, and held that as far as Plaintiff

intended to state a hostile work environment claim, he had fallen short.  (*See id*. at 14–16.)  The

---

[31] Plaintiff also includes statements of fact about Plaintiff being denied a badge that other officers who retire are provided.  (Pl.'s 56.1 Counter ¶¶ 129–131.)  Plaintiff does not attempt to explain, and the Court does not see how, these statements are relevant to Plaintiff's remaining retaliation claims.

Court also noted that Plaintiff's opposition brief was the first instance where Plaintiff made a retaliation claim under Title VII, and thus allowed Plaintiff to amend his Complaint to properly assert that claim. (*See id.* at 16–17.)

Plaintiff filed his Amended Complaint on April 7, 2017. (Am. Compl.) Pursuant to a briefing schedule entered by the Court on June 1, 2017, (*see* Dkt. No. 34), Defendants filed their second motion to dismiss the hostile work environment and disparate treatment claims, along with accompanying papers, on June 30, 2017, (*see* Dkt. Nos. 40–42). Plaintiff filed a memorandum in opposition to the motion on August 1, 2017. (Dkt. No. 43.) On August 14, 2017, Defendant filed a reply. (Dkt. No. 44.)

On January 11, 2018, the Court issued an Opinion and Order granting Defendants' motion to dismiss the Amended Complaint with respect to Plaintiff's hostile work environment and disparate treatment claims, so that the only surviving claim is Plaintiff's retaliation claim. (*See* January 11, 2018 Opinion & Order ("January 2018 Opinion") 18–19 (Dkt. No. 45).)

On January 25, 2018, Defendants filed their Answer. (Dkt. No. 46.) On January 30, 2018, the Court held a status conference and adopted a case management order. (Dkt. (minute entry for Jan. 30, 2018); Dkt. No. 47.) The case was referred to mediation, which was ultimately unsuccessful. (Dkt. Nos. 48–49.) On June 7, 2018, the Court extended the discovery deadline upon the Parties' request. (Dkt. No. 50.)

On September 7, 2018, counsel for Defendants submitted a pre-motion letter to the Court requesting permission to file a Motion for Summary Judgment. (*See* Letter from Michael H. Sussman, Esq., to Court (Dkt. No. 51).) On September 13, 2018, the Court held a pre-motion conference, (*see* Dkt. (minute entry for Sep. 13, 2018)), and issued a Motion Scheduling Order, (Dkt. No. 52).

On November 16, 2018, Defendants filed their Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement. (Not. of Mot.; Volpe Decl.; Fortunato Decl.; Flax Decl.; Gilman Decl.; Defs.' 56.1; Weissman Decl.; Lopez Decl.; Defs.' Mem.)

On December 13, 2018, Plaintiff filed his Opposition to the Motion, (Dkt. No. 66–69), and also moved for a limited re-opening of discovery for the purpose of conducting additional depositions, (Dkt. No. 66). On December 18, 2018, Defendants consented to a brief re-opening of discovery, (Dkt. No. 71), and on December 19, 2018, the Court entered an order to that effect, (Dkt. No. 72).

On February 15, 2019, Plaintiff filed a memorandum of law in support of his opposition to Defendants' Motion, a reply to Defendants' Rule 56.1 Statement, and further exhibits. (Pl.'s Mem.; Sussman Aff.; Pl. Aff.; Pl.'s 56.1 Reply; Pl.'s 56.1 Counter.)

On March 1, 2019, Defendants filed a reply and supporting documents. (Defs.' Reply; Reply Aff. of Robert B. Weissman, Esq. ("Weissman Reply Aff.") (Dkt. No. 78).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River*

*v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

B. Analysis

The only adverse action that remains contested in this Action is the suspension of Plaintiff's salary and his being placed and kept on leave without pay status.[32] Defendants argue

---

[32] Plaintiff's Amended Complaint asserts a Title VII retaliation claim, alleging three retaliatory acts: (i) the January 9, 2015 order to return to work, (ii) the suspension of Plaintiff's salary when he did not return to work, and (iii) the termination of Plaintiff's employment. (*See generally* Am. Compl.) Defendants argue at length that Plaintiff's first and third retaliation claims are not viable because Plaintiff cannot show a causal connection between his filing of the EEOC Charge and those actions. (Defs.' Mem. 2, 8–12.) In response, Plaintiff agreed to not pursue the first and third retaliation claims. (Pl.'s Mem. 1.) Therefore, the only adverse action that remains contested is the second retaliation claim, that is, the suspension of Plaintiff's pay and the placing and keeping of Plaintiff on leave without pay status. (*Id.*; Defs.' Reply 1.)

Defendants also argue that Plaintiff cannot state a claim based on the termination of his health insurance because that claim does not appear in Plaintiff's Amended Complaint. (Defs.' Mem. 24–25.) The Court does not understand Plaintiff to be basing his remaining retaliation claim on the termination of his health insurance, as Plaintiff concedes that the only remaining

that Plaintiff's retaliation claim fails because Plaintiff does not make out a prima facie case of retaliation as to the suspension of his salary and the change in his status, and because Defendants have multiple legitimate non-discriminatory reasons for placing and keeping Plaintiff on leave without pay. (Defs.' Mem. 18–24.)

Title VII prohibits discrimination against an employee "because he [or she] has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). Courts analyze claims for retaliation pursuant to Title VII under the familiar three-part framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (Title VII claim); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (retaliation claim). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then defendant's burden to proffer a legitimate non-

---

retaliatory action in question is the placing of Plaintiff on AWOL status, or suspending his leave when he did not return to work. (Pl.'s Mem. 1.)

    The Court also does not understand Plaintiff to be basing his retaliation claim on the denial of the badge that officers are afforded at retirement. Plaintiff did not mention the denial of the badge in his Amended Complaint or in the original Complaint, (*see* Am. Compl; Compl.), never sought leave to further amend the Amended Complaint to add this allegation, and only includes one sentence to argue that the denial of the badge is an adverse action, (Pl.'s Mem. 27). *See Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *12 n.12 (N.D.N.Y. Nov. 17, 2017) (noting that courts need not consider "cursory arguments" where a party has "failed to support its argument with any meaningful measure of factual or legal argument" (citation omitted)). Even if Plaintiff had argued at any length that the denial of the badge was a retaliatory actions, "[c]laims that are entirely new—that is, claims based [on] new facts and new legal theories with no relation to the previously pled claims—are commonly rejected at the summary judgment stage due to the prejudice to the defendant, who may not have had fair notice of the claim and consequently may not have had an adequate opportunity for discovery." *Coudert v. Janney Montgomery Scott, LLC*, No. 03-CV-324, 2005 WL 1563325, at *2 (D. Conn. July 1, 2005); *see also Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) ("Because [the plaintiff] failed to include this claim in his Amended Complaint, instead raising it for the first time in opposition to summary judgment, it is waived." (footnote omitted)). Such would be appropriate here.

discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams*, 764 F.3d at 251. "The employee at all times bears the burden of persuasion to show retaliatory motive." *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).

### 1. Prima Facie Case of Retaliation

The Second Circuit has identified four elements for a prima facie case of retaliation: "(1) [the plaintiff's] participation in a protected activity; (2) that [the defendant] knew of [the plaintiff's] participation in that protected activity; (3) that [the plaintiff] suffered an adverse employment action; and (4) that there exists a causal relationship between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Defendants argue that Plaintiff fails to state a prima facie case for retaliation because Defendants did not have knowledge of the protected conduct when they placed Plaintiff on leave without pay on January 23, 2015, *three days before* the EEOC Notice of Charge arrived in the County's mail on January 26, 2015. (Defs.' Mem. 18.)[33] Plaintiff counters that it was *four days*

---

[33] The Court does not understand Defendants to be challenging any other elements of Plaintiff's prima facie retaliation case. Defendants do not, and indeed cannot successfully, argue that Plaintiff does not satisfy the first element of a prima facie retaliation case because he engaged in the protected activity of filing an EEOC charge. *See Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 776 (E.D.N.Y. 2018) (holding that the filing of an EEOC charge is protected activity for purposes of a Title VII retaliation claim).

Defendants also do not, and indeed cannot successfully, argue that Plaintiff does not satisfy the third element of a prima facie retaliation case because being placed on unpaid leave, specifically incurring the loss of pay and benefits, is a prototypical adverse action. *See Patrolmen's Benevolent Assoc. v. City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (stating that a materially adverse action "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits," among other things); *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 305–06 (E.D.N.Y. 2014) (holding that the termination of employee's use of compensatory time to cover absences at work was an adverse action).

As for the fourth element of a prima facie retaliation claim, "the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected

*after* learning of the EEOC charge, on January 30, 2015, that Defendants placed Plaintiff on AWOL status.  (Pl.'s Mem. 22–23.)

The record supports Defendants' argument that Plaintiff's status changed on January 23, 2015, and that they did not know about the EEOC charge at that time.  Defendants submit the Declarations of Volpe, Fortunato, and Gilman, as well as Gilman's contemporaneous notes, as evidence that Volpe placed Plaintiff on LWOP status on January 23, 2015.  (Defs.' 56.1 ¶ 81 (citing Volpe Decl. ¶ 14; Fortunato Decl. ¶ 12; Gilman Decl. ¶¶ 6–10, Gilman Record RC 836).) Specifically, there is evidence that Volpe told Gilman of Plaintiff's LWOP status change on January 23, 2015.  (*Id*. ¶ 84 (citing Volpe Decl. ¶ 14; Gilman Decl. ¶ 6, Gilman Record RC 836).)  Fortunato also wrote an email on January 23, 2015 advising Volpe to place Plaintiff on

---

activity was closely followed in time by the adverse action."  *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (citation and quotation marks omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse actions can be sufficient to establish causation." (citing *Cifra*, 252 F.3d at 217)); *Campbell v. N.Y.C. Transit Auth.*, 93 F. Supp. 3d 148, 177–78 (E.D.N.Y. 2015) (same).  There is "no bright-line rule" for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference.  *Arroyo-Horne v. N.Y.C. Police Dep't*, No. 16-CV-3857, 2016 WL 8711061, at *3 (E.D.N.Y. Dec. 9, 2016); *see also Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 457 (E.D.N.Y. 2011) ("With regard to the establishment of a prima facie case through temporal proximity, the Second Circuit has not drawn a bright line as to how closely an adverse employment action must follow protected activity to imply that retaliation has taken place." (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009))); *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) ("There is no bright-line beyond which a temporal relationship is too attenuated to prove causation." (citations omitted)).  Here, there is no dispute that Defendants learned about the EEOC Charge on January 26, 2015, (Defs.' 56.1 ¶¶ 38–39), and that as of that date Defendants kept Plaintiff on leave without pay status until at least June 12, 2015, (*id*. ¶ 222), and ultimately terminated his employment on February 9, 2016, (February 8 Termination Notices).  The adverse action of being placed on leave without pay was instantaneous, and continued for several months after, Defendants learned about Plaintiff's EEOC Charge.  This temporal proximity is sufficient to establish a causal connection for purposes of Plaintiff's prima facie case.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110–11 (2d Cir. 2010) (stating that the Second Circuit has not defined "the outer limits beyond which a temporal relationship is too attenuated to establish causation" but that "five months is not too long to find the causal relationship").

LWOP, and he did not know at that time that Plaintiff had filed the EEOC Charge.  (*Id*. ¶ 86 (Fortunato Decl. ¶¶ 10, 13).)  On January 23, 2015, neither Volpe, (*id*. ¶ 87 (Volpe Decl. ¶ 17)), nor Gilman knew that Plaintiff had filed the EEOC Charge, (*id*. ¶ 88 (Gilman Decl. ¶ 11)).

As discussed *supra* note 12, Plaintiff's argument that Volpe only advised him that he was placed on LWOP status on January 30, 2015, not January 23, 2015, (Pl.'s 56.1 Reply ¶ 81 (citing Volpe Dep. 50; January 30 Letter)), is unavailing.  That Plaintiff only received the letter on January 30, 2015, does not contradict the evidence Defendants marshal in support of their claim that Plaintiff's status was changed on January 23, 2015.  At best, Plaintiff's statement raises a question about whether he was timely informed of the status change, which does not change the date that Defendants actually changed his status.  Thus, the record supports Defendants' argument that Plaintiff's status was first changed to LWOP on January 23, 2015, and that at that time Defendants had no knowledge of the EEOC Charge.

However, even though Defendants did not know of the protected activity when they *first* placed Plaintiff on leave without pay, Defendants did know of his protected activity after January 26, 2015, when they repeatedly made the decision to keep Plaintiff on leave without pay status or unpaid leave.  (Defs.' 56.1 ¶¶ 157–59, 206; Volpe Decl. ¶ 37; Fortunato Decl. ¶¶ 31–32.)  Even when Plaintiff's FMLA leave was granted and he was changed from LWOP to FMLA status, he was on *unpaid* FMLA leave.  (Defs.' 56.1 ¶ 129; FMLA Request Form.)  Plaintiff was only issued a lump-sum payment for his accrued leave on June 12, 2015, (Defs.' 56.1 ¶ 222), and then yet later issued payment for 32 hours of personal leave, (*id*. ¶ 223), and for all remaining accrued vacation, sick leave, and personal leave, (*id*. ¶ 224).  Defendants admit that they received the EEOC Charge and had knowledge of Plaintiff's protected activity as of January 26, 2015, so Defendants cannot successfully argue that they did not know of Plaintiff's EEOC charge when

they made subsequent decisions about Plaintiff's status in late 2015 and early 2016. Therefore, Defendants' argument that they did not have the requisite knowledge fails, at least with respect to keeping Plaintiff on leave without pay status after January 26, 2015. *Cf. Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005) (noting that a jury could find an employer's knowledge of protected activity from circumstantial evidence); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (holding that "a jury . . . can find retaliation even if the [defendant] denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities"); *cf. also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the [corporate defendant's] agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."). Plaintiff thus establishes a prima facie case of retaliation.

### 2. Non-Discriminatory Reasons

Turning to the second step of the *McDonnell Douglas* burden-shifting analysis, Defendants argue that the inadequacy of Plaintiff's January 15 "under my care" note, the inadequacy of the further medical documentation Plaintiff provided, and Plaintiff's obstruction of Dr. Flax's IME, were non-discriminatory reasons for placing and keeping Plaintiff on leave without pay. (Defs.' Mem. 1, 18–24.)

First, with respect to the January 15 Note, Defendants correctly point out that the Note only conveyed that Plaintiff was a patient in Dr. Notaristefano's care and that he could not return to work until further notice. (January 15 Note.) The Note did not state what illness or disability Plaintiff had and provided no explanation as to why he could not work. (*Id.*) Article XII, § 5 of the CBA required that the employee notify the Sheriff of *the reason* for taking sick leave and to

*submit proof* of his or her illness or disability. (Defs.' 56.1 ¶ 48.) Defendants communicated internally about the insufficiency of Plaintiff's January 15 Note and that lack of evidence of his disability or illness warranted placing him on AWOL status. (*Id*. ¶ 79.)

Second, as to the inadequacy of subsequent submissions by Dr. Notaristefano, Defendants point out that Dr. Notaristefano had a criminal record and had been professionally censured, (Defs.' 56.1 ¶¶ 60–61), and that this made Fortunato and Volpe suspicious of the documents she submitted to the County, (Fortunato Decl. ¶ 16). Moreover, Dr. Notaristefano was an internist not a psychiatrist or a psychologist. (Defs.' 56.1 ¶¶ 56–59.) As such, Fortunato and Volpe believed that Dr. Notaristefano was not medically qualified to opine on Plaintiff's psychiatric condition or its impact on Plaintiff's ability to carry out his duties as a correctional officer. (*Id*. ¶ 110 (citing Volpe Decl. ¶¶ 26, 28; Fortunato Decl. ¶ 19).) The January 31 Form from Dr. Notaristefano's office stating that Plaintiff had chronic "PTSD/depression" from September 9, 2013 through January 31, 2015 further led Fortunato and Volpe to believe that Plaintiff was not being honest about his medical condition. Their belief was reinforced by "[t]he claim of a psychiatric disability by a doctor without the expertise to render such a diagnosis," "[Dr.] Notaristefano's failure to distinguish [P]laintiff's current status from when he was able to work, . . . [and her] failure to address [Plaintiff's] status for the two weeks preceding the January 31 [F]orms." (*Id*. ¶ 111 (citing Volpe Decl. ¶¶ 29–30; Fortunato Decl. ¶¶ 23–25).) Defendants further point out that the February 18 Note, which stated that Plaintiff had been "under the care of Dr. Timothy Welles . . . for extended treatment," that he had chronic and recurring PTSD, and that he was "not able to return to work until July 1, 2015, provided his PTSD symptoms have decreased enough," (*id*. ¶ 138), did not mention Plaintiff's ability to work prior to February 18, 2015, (*id*. ¶ 139), and was therefore inadequate.

Finally, Defendants point to Plaintiff's February 5 Letter instructing the County not to contact his doctors, (February 5 Letter), his failure to answer questions and to complete the MMPI during the February 13, 2015 IME with Dr. Flax, (Defs.' 56.1 ¶¶ 132–36), the months-long back and forth and delay in providing all the necessary records to Dr. Flax, (Defs.' 56.1 ¶¶ 138, 145–49, 160–64, 167, 174–76, 183, 186–88, 196), the ultimate need to involve Plaintiff's attorney and union representative to ensure the production of the necessary records, (*id.* ¶¶ 193–95), and Defendants' internal communications expressing their concern regarding Plaintiff's failure to complete the IME, (*id.* ¶ 158), as evidence of Plaintiff's obstruction of the IME, (Defs.' Mem. 22–24).

Because Defendants' "burden is only one of production," *Figueroa v. KK Sub II, LLC*, 289 F. Supp. 3d 426, 441 (W.D.N.Y. 2018), and because they submitted evidence showing that Plaintiff was placed and kept on leave without pay status because of inadequate medical documentation of his illness and because of his potential obstruction of the IME, Defendants have satisfied their burden at step two of the *McDonnell Douglas* framework.

### 3. Pretext

Because Defendants proffer several legitimate reasons for Plaintiff being placed on leave without pay status, the burden shifts to Plaintiff, at the third step of *McDonnell Douglas*, to demonstrate that the reasons Defendants offer are "merely a pretext for discrimination." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999). "The Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845–46 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "'But-

for' causation," however, "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action[,] [as] [f]rom such discrepancy, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* It bears noting that in considering these factors, the Second Circuit has cautioned that "[t]he determination of whether retaliation was a 'but-for' cause . . . is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Id.* at 846 n.5.[34]

Here, Plaintiff submits enough evidence, although barely, to raise disputes about weaknesses and inconsistencies in Defendants' proffered reasons so as to allow a reasonable

---

[34] Defendants argue that Plaintiff fails to establish but-for causation because he does not produce any evidence regarding similarly situated comparators who provided insufficient medical documentation for their absence or who were allowed to use sick leave before the receipt of the examiner's opinion. (Defs.' Reply 5–9.) Defendants do not, however, cite to any caselaw, and the Court is not aware of any, that states that a plaintiff in a retaliation case must introduce evidence of a similarly situated comparator to establish pretext. Plaintiffs certainly may use evidence of similarly situated comparators who were treated differently as evidence of pretext, but caselaw in the Second Circuit makes clear that plaintiffs may establish pretext and avoid summary judgment without introducing evidence of similarly situated comparators. *See, e.g.*, *Zann Kwan*, 737 F.3d at 847 (finding that the plaintiff established pretext because there were weaknesses and contradictions in defendants' testimony regarding the adverse action, even though plaintiff did not introduce any evidence of similarly situated comparators); *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 655 (S.D.N.Y. 2015) (same); *Meyer v. Medco Health Sols., Inc.*, No. 09-CV-9216, 2015 WL 1500217, at *18 (S.D.N.Y. Mar. 31, 2015) (same); *Vera v. Emergency Ambulance Serv.*, No. 12-CV-1199, 2014 WL 6473515, at *5 (E.D.N.Y. Nov. 18, 2014) (same). Therefore, the fact that Plaintiff does not provide evidence regarding similarly situated comparators who submitted insufficient medical documentation or who used sick leave before an IME, is not outcome determinative as to whether Plaintiff establishes pretext.

juror to conclude that Defendants' proffered reasons were a pretext. For example, Plaintiff

argues that he provided all necessary authorizations, and documents in his possession, that he

attempted to complete the IME in a timely manner, and that the documentation he provided

clearly showed that he was gravely ill. (Pl.'s Mem. 23–26.)

Plaintiff further points out that the first time he was notified of the deficiency in the

January 15 Note, was on January 30, 2015, (January 30 Letter), and that Dr. Notaristefano

submitted an updated note with further details about Plaintiff's chronic PTSD the very next day,

(January 31 Forms).

Plaintiff also points to his February 5 Letter in which he expressed that he had Dr.

Notaristefano submit documentation specifically to avoid any sanctions. (February 5 Letter.)

Although Plaintiff in that Letter did object to Defendants contacting his doctors, he also stated

that he would attend and comply with the IME. (*Id*.)

Plaintiff also points to evidence to contradict Defendants' account of the February 13,

2015 IME with Dr. Flax. Plaintiff states that during that appointment, he provided Dr. Flax

information about his work activities, psychiatric medication, and psychiatric history, and with

authorization to obtain medical records from Nyack Hospital, New York Presbyterian Hospital,

Stat Health, Parvesh Sharma, Howard Rombom, and Behavioral Medicine Associates. (Pl. Aff.

¶ 24.) He told Dr. Flax that he did not remember the names of all the medications he was taking,

but he explained why he was taking them and what the effect of each was. (*Id*.) Plaintiff also

stated that he started to take the MMPI, but told Dr. Flax that he was too distracted and stressed

to complete the test that day, and that he checked into the inpatient unit at New York

Presbyterian two days later and stayed there for eight days. (*Id*. ¶ 25.) Plaintiff eventually

completed the MMPI on April 14, 2015. (Defs.' 56.1 ¶ 180.)

Plaintiff also points to the numerous communications his doctors had with the County to explain Plaintiff's treatment. The February 7 Forms stated that Plaintiff was suffering from "anxiety, PTSD, insomnia, suicidal thoughts, hearing voices," and that the estimated period of incapacity began on January 16, 2015. (February 7 Forms.) The February 7 Forms also indicated that Plaintiff had been referred to a psychiatrist, Dr. Sharma, and a behavioral therapist, Dr. Stak, but the Forms did not include any medical documentation from Dr. Sharma or Dr. Stak. (*Id.*) The February 18 Note stated that Plaintiff had received extended treatment for chronic and recurring PTSD and that he would not be able to return to work until July 1, 2015 because of his PTSD symptoms." (Defs.' 56.1 ¶¶ 138–39.) The March 12 Note stated that Plaintiff was "psychologically disabled and not able to perform his normal duties as a correction officer at this time." (*Id.* ¶ 156.)

Plaintiff provided further authorizations of his medical records on March 30, 2015, for Dr. Sharma, (*id.* ¶ 171), and on April 23, 2015, for Dr. Notaristefano, (*id.* ¶ 186). As for the Social Security records, Plaintiff states that he did not have those records in his possession. (Pl.'s 56.1 Reply ¶ 194 (citing Pl. Aff. ¶ 40).)

Plaintiff points out that Fortunato admitted that, while Defendants were seeking medical records from Plaintiff, Fortunato did not know whether Plaintiff actually had those medical records in his possession and whether he was refusing to produce them. (*Id.* ¶ 98 (citing Fortunato Dep. 135).) Fortunato also testified that he was not aware whether anyone from the County had communicated the demands for medical authorizations to Plaintiff prior to February 24, 2015, and he does not recall telling Volpe that he should contact Plaintiff to ask him to complete such authorizations. (Pl.'s Counter ¶¶ 71, 75 (citing Fortunato Dep. 112, 115).)

Plaintiff also points out that, although Defendants repeatedly emphasize that an employee on leave without pay status cannot get paid accruals, (*id.* ¶ 15 (citing Volpe Dep. 53)); Defs.' 56.1 ¶ 83 (citing Volpe Decl. ¶ 14)), Volpe did at one point testify that an employee on FMLA leave had the option to exhaust his or her accruals, (Pl.'s 56.1 Counter ¶ 40 (citing Volpe Dep. 66)).  Plaintiff was placed on FMLA status as of March 12, 2015 and thus there is at least a question as to why he was not able to exhaust his accruals at that point.

Plaintiff and Dr. Flax communicated on several occasions in March 2015 in an attempt to advance the IME process.  (Defs.' 56.1 ¶¶ 165–73.)  Throughout the process of completing the IME, Plaintiff's counsel and union representative were in communication with Defendants to explain that Plaintiff was attempting to cooperate with Dr. Flax and to ask that he be placed on paid status because he was facing economic hardship from being placed on leave without pay. (April 8 Email; March 18 Emails; Defs.' 56.1 ¶¶ 164, 177, 192–93, 195.)

Finally, Dr. Flax ultimately did diagnose Plaintiff with a General Personality Disorder and Unspecified Psychotic Disorder that prevented him from working as a corrections officer, (Defs.' 56.1 ¶¶ 201–04), and Plaintiff received an Article 15 Disability Retirement because he was found to be "permanently incapacitated for the performance of his duties," (*id.* ¶¶ 246–49).

Based on this evidence, a reasonable juror could conclude that Plaintiff did not ultimately obstruct the IME process, that he substantially provided necessary medical documentation, and that Defendants' proffered reasons for suspending Plaintiff's salary were pretextual, and Plaintiff's protected activity was a but-for cause of his termination.  *See Zann Kwan*, 737 F.3d at 847 (holding that the plaintiff's evidence of defendants' inconsistent explanations for adverse action against the plaintiff "and the very close temporal proximity between [the plaintiff's] protected conduct and [the adverse action] are sufficient to create a triable issue of fact with

regard to whether the [non-discriminatory reasons were] a but-for cause of" the adverse action); *Cowan*, 95 F. Supp. 3d at 655 (denying summary judgment where inconsistencies in contemporaneous reports about the plaintiff's performance along with temporal proximity between protected activity and adverse action created a triable issue as to whether termination of employee for performance issues was pretext for retaliation); *Meyer*, 2015 WL 1500217, at *18 (denying summary judgment where the plaintiff was denied a bonus after filing EEOC charge because taken together, "weaknesses, inconsistencies, and contradictions in defendant's explanation," including ambiguous language of the termination letter and conflicting testimony about whether plaintiff had earned her bonus, were sufficient evidence of pretext); *Vera*, 2014 WL 6473515, at *5 (denying summary judgment where the plaintiff's testimony contradicted the defendants' claim that the plaintiff failed to complete employer-mandated anger management classes).

## III. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is denied. The Clerk of the Court is respectfully ordered to terminate the pending Motion. (See Dkt. No. 55.) The Court will hold a Status Conference on July 18, 2018 at 3:00 p.m.

SO ORDERED.

Dated: June 17, 2019
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

55